**Lucy VILLAGOMEZ, Individually, and as Representative of the Estate of Ismael Villagomez, Deceased, and Francisco Villagomez and Maria Villagomez, Appellants,**

v.

**ROCKWOOD SPECIALTIES, INC., Appellee.**

No. 13–05–389–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Nov. 30, 2006.

Alice Oliver–Parrott, Burrow & Parrott, LLP, Maria Teresa Arguindegui, Law Office of Maria Teresa Arguindegui, David H. Burrow, Houston, Houston Munson, Munson, Burns, Munson & Munson, Gonzales, for appellants.

Gerald L. Bracht, Solace Kirkland Southwick, Andrews & Kurth, Houston, for appellee.

Before Chief Justice VALDEZ and Justices CASTILLO and GARZA.

## OPINION

Opinion by Justice GARZA.

Lucy Villagomez, individually and as representative of the estate of Ismael Villagomez, deceased, Francisco Villagomez and Maria Villagomez (collectively "the Villagomez family") appeal from the trial court's order granting a special appearance by Rockwood Specialties, Inc., a foreign corporation whose direct acts and omissions are alleged to have proximately caused the wrongful death of Mrs. Villagomez's husband, Ismael Villagomez, who was working in Gonzales, Texas at the time of his death. Because we hold that Rockwood failed to negate the existence of personal jurisdiction, we reverse the trial court's order and remand the case for further proceedings consistent with this opinion.

## I. Background

Ismael Villagomez suffered catastrophic burns from direct exposure to massive amounts of steam while cleaning an empty batching tank. At the time of the accident, Mr. Villagomez was on-the-job and acting under the direction of his employer, Southern Clay, Inc., a Texas corporation with its principle place of business in Gonzales, Texas. Although Mr. Villagomez's injuries were fatal, he did not die immediately. He was alive when paramedics arrived on the scene. He was later transported to a local hospital, where he was declared dead.

Mr. Villagomez's family subsequently filed suit against Southern Clay, alleging negligence and gross negligence. The Villagomez family also sued Southern Clay's parent company, Rockwood Specialties, Inc., a Delaware corporation headquartered in Princeton, New Jersey. The claims against Rockwood include negligence, gross negligence, and negligent undertaking.

Rockwood made a special appearance before the trial court, arguing that the court lacked personal jurisdiction to hear any claims against Rockwood because it is

an out-of-state corporation lacking minimum contacts with Texas. The trial court granted the special appearance and the Villagomez family has appealed to this Court.

## II. Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 805–06 (Tex.2002). In resolving this question of law, a trial court must frequently resolve questions of fact. *See id.* at 806. On appeal, the trial court's determination to grant or deny a special appearance is subject to de novo review, but appellate courts may also be called upon to review the trial court's resolution of a factual dispute. *See id.* The standard of review applicable on appeal from the resolution of such factual disputes in a special appearance proceeding was recently clarified by the Texas Supreme Court in *BMC Software:* "If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002).

In the case at bar, the trial court granted Rockwood's special appearance and later adopted, word-for-word, virtually all of the 67 proposed findings of fact and 14 proposed conclusions of law drafted and submitted by Rockwood. The trial court denied extensive written objections filed by the Villagomez family, including among other numerous, detailed objections, challenges to the legal and factual sufficiency of the evidence to support the findings proposed by Rockwood. The court later denied all of the supplemental findings of fact and conclusions of law submitted and requested by the Villagomez family.

Following the precedent set by the Texas Supreme Court in *BMC Software*, the Villagomez family has appealed virtually all of the trial court's findings of fact on legal and factual sufficiency grounds. In addition, they have raised challenges to the trial court's conclusions of law and other substantive issues.

Although a trial court's findings of fact may be challenged for legal and factual sufficiency, we find problematic the mechanical application of the *BMC Software* precedent to the facts of this case. The trial court heard no live testimony; yet, the case is riddled with factual disputes. Furthermore, many of the trial court's findings of fact cannot be reconciled with the admitted and uncontested evidence in the record.

The reporter's record shows that the trial court decided the special appearance by reviewing a cold record of deposition testimony, affidavits, and other evidence. The hearing on Rockwood's special appearance was non-evidentiary, and all of the evidence was admitted by stipulation. The parties presented only legal arguments at the hearing.

While this may not have been error, it certainly should affect the amount of deference given to the trial court's findings of fact on appeal. **Compare** Tex.R. Civ. P. 120a(3) (permitting "oral testimony" to resolve special appearance) **and** *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 782 (Tex.2005) (noting that "manner of [evidence] presentation is discretionary" in special appearances) **with** *Union Carbide Corp. v. Moye*, 798 S.W.2d 792, 794 (Tex.1990) (Hecht, J. concurring) (contending that trial courts are "authorized and even obliged by rule 258 to hear live testimony when it is necessary to resolve issues that cannot be determined on a written record" and then stating that

"proceedings under rule 258 are similar [in that regard] to those under rule 120a").

For instance, the trial court's findings could not have been based on evaluations of credibility or demeanor. *See Union Carbide,* 798 S.W.2d at 798 (Gonzalez, J. dissenting) ("It is difficult, if not impossible, for the trial judge to evaluate the credibility of the witnesses and the weight to be given their testimony from reading the cold record. The importance of the issues at stake and the difficulty of adjudication by reading the record, require that the parties have the right to a hearing in open court."). Indeed, there is no possibility the trial court could have used any of its unique fact-finding functions to resolve conflicts in the evidence, as the trial court did not occupy its fact-finding position at the hearing on the special appearance. Although a court which holds an evidentiary hearing and acts as the finder of fact is owed special deference because of its unique position to hear live testimony and resolve conflicts in the evidence, a court that issues findings based on a cold record is in virtually the same position as the appellate court that reviews its findings. *See Benoit v. Wilson,* 150 Tex. 273, 282, 239 S.W.2d 792 (1951) (holding that a "court should never set aside a jury verdict merely because the jury could have drawn different inferences or conclusions" because the jury "has considered all the facts admitted before it and has, by its answers, selected from the conflicting evidence and conflicting inferences that which it considered most reasonable.").

It is thus unclear why the trial court's findings should be given any special deference in circumstances such as these. *See Otis Elevator Co. v. Parmelee,* 850 S.W.2d 179, 181 (Tex.1993) ("Here, the trial court heard no evidence but expressly based its decision on the papers filed and the argument of counsel. Under these circumstances, there are no factual resolutions to presume in the trial court's favor."). Certainly, there is no intuitive reason for giving the trial court's findings deference equal to those of a jury that sat through the presentation of evidence and testimony and later deliberated to resolve conflicts in the evidence. *See, e.g., Texlan, Inc. v. Freestone County,* 282 S.W.2d 283, 288–89 (Tex.Civ.App.-Waco 1955, no writ) ("The jury, being the trier of the facts, had the duty and responsibility of passing upon the credibility of the witnesses and determining the ultimate issues before them and, in so doing, they could reject or accept the testimony of each witness in whole or in part as they found the facts to be.").

For the foregoing reasons, we do not proceed to the merits of this appeal without stating that we are troubled by application of the traditional standards of legal and factual sufficiency reviews to the case at bar. Notwithstanding these concerns, we conduct the due-process personal-jurisdiction review by crediting evidence that supports the trial court's findings of fact if reasonable jurors could, and by disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

Before applying this standard, we draw a clear distinction between the trial court's findings of fact and the trial court's conclusions of law. The trial court's findings of fact may be reviewed individually for legal and factual sufficiency, but the trial court's conclusions of law are not susceptible to such review. *BMC Software,* 83 S.W.3d at 794. Instead, the trial court's conclusions of law are reviewed de novo for legal correctness based on the facts of the case. *Id.*

In reviewing the correctness of the trial court's application of the law to the facts of this case, we do not necessarily limit "the facts of the case" to the trial court's find-

ings of fact. Limiting "the facts of the case" to the trial court's findings of fact would create an unnecessary bias for upholding the trial court's resolution of the broader, determinative question of whether the defendant carried its burden to negate all bases for personal jurisdiction. *See BMC Software*, 83 S.W.3d at 793.

◼ In this case, the trial court's findings of fact focused almost exclusively on the contacts that Rockwood does not have in Texas. As the Villagomez family complains on appeal, the trial court failed to issue additional findings of fact that they had requested and that were supported by uncontested and admitted evidence. The additional findings of fact requested by the Villagomez family tended to establish Rockwood's various forum contacts. If, on appeal, "the facts of the case" were limited to the trial court's findings of fact, Rockwood would appear to have fewer forum contacts than what was established by the admitted and undisputed evidence. Yet, this result is not clearly contemplated in the trial court's findings, which are silent on these contacts. In short, we have no basis for concluding that the trial court found that these unstated contacts did not exist or that they were otherwise inadequately supported by the evidence. We are also mindful that a trial court has no need to make findings concerning facts that are admitted. *See, e.g., Tex. Eastern Transmission Corp. v. Sealy Indep. Sch. Dist.*, 572 S.W.2d 49, 51 (Tex.Civ.App.-Houston [1st Dist.] 1989, no writ).

The analysis below is a de novo review of the correctness of the trial court's answer to the legal question of personal jurisdiction. The analysis demonstrates that Rockwood failed to carry its burden to negate all bases for jurisdiction because the facts of the case show that Rockwood has had continuous and systematic contacts in Texas. In conducting this analysis and reviewing the facts of the case, we consider the evidence and reasonable inferences supporting the trial court's findings of fact, as well as evidence that is (1) contextual, (2) undisputed and admitted, and (3) allows of only one logical inference. Because such evidence cannot be disregarded by a reasonable trier of fact, it is the same evidence that would be reviewed in a legal sufficiency analysis. *See City of Keller*, 168 S.W.3d at 827. Based on this evidence, we hold that Rockwood did not meet its burden of negating jurisdiction and that the trial court erred as a matter of law by granting Rockwood's special appearance and dismissing the claims against it for lack of personal jurisdiction.

## III. Due Process Limitations on the Exercise of Personal Jurisdiction

◼ In the context of due process restrictions on the exercise of personal jurisdiction, the United States Supreme Court has recognized that the individual interest protected is in not being subject to the binding judgments of a forum with which the defendant has established no meaningful contacts, ties, or relations. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 526, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); *Burger King*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Supreme Court has reaffirmed the oft-quoted reasoning of *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), that minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94

L.Ed.2d 92 (1987) (citing *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174). Where a defendant has "continuous and systematic general business contacts" with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the court may exercise "general" jurisdiction over any action brought against that defendant. *Id.* at 414 n. 9, 104 S.Ct. 1868. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 414 n. 8, 104 S.Ct. 1868. The exercise of personal jurisdiction over a nonresident defendant must also comport with fair play and substantial justice. *See Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174; *Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex.2005).

## A. General Jurisdiction

■ Determining the existence of personal jurisdiction does not involve an examination of each contact with Texas viewed in isolation from one another. *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir.1986). Rather, we are required to examine the contacts *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process. *Id.; Am. Type Culture*, 83 S.W.3d at 809. Nevertheless, the continuous and systematic contacts test remains a difficult one to meet, requiring extensive contacts between a defendant and a forum. *Submersible Sys. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 419 (5th Cir.2001). Only once has the United States Supreme Court upheld an exercise of personal jurisdiction when the suit was unrelated to the defendant's contacts with a forum (i.e., based on general jurisdiction). *Id.* (referring to *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485

(1952) (holding that Ohio courts could exercise general jurisdiction over foreign corporation)).

■ General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed. *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir.1999). "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *See Asahi*, 480 U.S. at 109, 107 S.Ct. 1026 (quoting *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. *See Asahi*, 480 U.S. at 110, 107 S.Ct. 1026. The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts or of the "unilateral activity of another party or a third person." *See Nacionales de Colombia*, 466 U.S. at 417, 104 S.Ct. 1868; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In the words of the Texas Supreme Court, "Certainly a nonresident corporation ought to be subject to suit in any jurisdiction where it 'enjoys the benefits and protection of the laws of that state.'" *Michiana Easy Livin' Country,*

*Inc. v. Holten,* 168 S.W.3d 777, 787 (Tex. 2005).

### 1. Rockwood's Contacts with Texas

Rockwood is a holding company. Its corporate life began in 2000, when it succeeded another holding company called Laporte, Inc. Before Rockwood was created, Laporte owned Southern Clay and other subsidiaries. Since the year 2000, Rockwood has been the sole owner of 13 subsidiaries doing business in various locations in the United States. Three of Rockwood's subsidiaries have extensive, ongoing corporate operations in Texas. Southern Clay, for instance, is organized under Texas law and has its principal place of business in Texas. Rockwood also owns Compugraphics U.S.A., Inc. and Chemical Specialties, Inc., which have physical locations and corporate operations in Texas.

■ Because the validity of these contacts as legitimate due process forum contacts may be unclear, it should be emphasized that under long-standing Texas law, separate corporations are to be treated as distinct entities. *See, e.g., BMC Software,* 83 S.W.3d at 798. The Texas Supreme Court addressed the separateness of corporate identities some four decades ago in *Bell Oil,* a case that involved the liability of a parent corporation in a lawsuit arising from the activities of its subsidiary:

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.

*Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336, 339 (Tex.1968) (quoting *State v. Swift & Co.,* 187 S.W.2d 127, 133–34 (Tex.Civ.App.1945, writ ref'd)).

Many years later, the Texas Supreme Court applied this general rule to a special appearance in *BMC Software,* an opinion which stated that two separate corporations are to be treated as distinct entities for purposes of personal jurisdiction unless an exception to the general rule is applicable. *See BMC Software,* 83 S.W.3d at 798 (reaffirming the general rule quoted in *Bell Oil*).

Given that the rule adopted in *Bell Oil* remains the law in Texas and considering that it has gone largely unchanged over the years, we conclude that in order to fairly apply the rule to the instant case, it is necessary to first understand the context in which the rule was originally articulated.

As noted above, *Bell Oil* adopted the general rule of corporate separateness from language in *Swift,* an opinion by the Texas Court of Civil Appeals. *See id.* Like *Bell Oil, Swift* did not involve any due process issues of personal jurisdiction. *See Swift,* 187 S.W.2d at 127. In articulating the general rule of corporate separateness that is now applied across the board, the court relied on three cases: (1) *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); (2) *State v. Humble Oil & Refining Co.,* 263 S.W. 319 (Tex.Civ. App.1924, writ ref.); and (3) *Berkey v. Third Avenue Ry. Co.,* 244 N.Y. 84, 155 N.E. 58 (1926). Although all three cases involved issues of corporate separateness, only *Cannon* dealt with corporate separateness in the context of personal jurisdiction.

In *Cannon,* a case which predates *International Shoe* and its progeny, the United States Supreme Court stated that "Congress has not provided that a corporation of one State shall be amenable to suit in the federal court for another State in

which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein." *Cannon,* 267 U.S. at 336, 45 S.Ct. 250. The Court further explained that "such use of a subsidiary does not necessarily subject the parent corporation to the jurisdiction." *Id.*

*Cannon's* place in today's jurisprudence of minimum contacts is perhaps debatable. Through its reliance on *Bell Oil* and *Swift,* the Texas Supreme Court has signaled that some continued application of pre-*International Shoe* case law is appropriate, at least as it relates to issues of corporate separateness.

Accordingly, in reaching today's decision, we are influenced by the Sixth Circuit's eloquent interpretation of *Cannon* vis-a-vis *International Shoe* from more than 40 years ago:

> [T]he mere ownership by a corporation of all of the stock of a subsidiary amenable to the jurisdiction of the courts of a state may not alone be sufficient to justify holding the parent corporation likewise amenable. In the early case of *Cannon Mfg. Co. v. Cudahy Packing Co.,* the Supreme Court held that the activities of a subsidiary did not subject its parent corporation to the personal jurisdiction of local courts.
>
> It should be noted that the ruling of the *Cannon* case, if not qualified by the subsequent ruling in the *International Shoe Company* case, has been at least qualified in later cases holding foreign corporations amenable to the personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious, or that the parent has held the subsidiary out as its agent, or, more vaguely, that the parent has exercised an undue degree of control over the subsidiary.

Unfortunately, such reasoning in these and similar cases, fails to explain the decisions of the courts adequately. Thus the law relating to the fictions of agency and of separate corporate entity was developed for purposes other than determining amenability to personal jurisdiction, and the law of such amenability is merely confused by reference to these inapposite matters.

The *International Shoe* decision represented an effort by the Supreme Court to clarify earlier concepts in the area of the amenability of foreign corporations to the personal jurisdiction of state courts by sweeping aside any lingering notions that the earlier shibboleths of "consent," "presence," and "doing business" were self-defining abstractions, and by redefining those tests in terms of "minimum contacts." Following this decision it would seem appropriate, for the purpose of determining the amenability to jurisdiction of a foreign corporation which happens to own a subsidiary corporation carrying on local activities, to inquire whether the parent has the requisite minimum contacts with the State of the forum. Thus the ownership of the subsidiary carrying on local activities in Michigan represents merely one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts with the State of Michigan, but is not sufficient of itself to hold the present foreign corporations amenable to personal jurisdiction.

*Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292, 296–97 (6th Cir. 1964) (internal citations omitted).

■ No theory has been alleged in this case that would permit the status of Rockwood and Southern Clay as separate and distinct corporations to be disregarded. *See id.* 83 S.W.3d at 799 ("To 'fuse' the

parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary."). For our purposes, Rockwood is a separate and distinct corporation from all of its subsidiaries, including those doing business in Texas. *See id.* at 798. This means that the subsidiaries' contacts with Texas cannot be imputed to Rockwood. *See id.* ("The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation."). In other words, the fact that the subsidiaries do business in Texas does not mean that Rockwood does business in Texas. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983) ("[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other.").

Preserving the corporate fiction allows Rockwood to remain distinct from its subsidiaries, but it does not mean that Rockwood ceases to own the subsidiaries. Ownership of a subsidiary conducting business in Texas is a forum contact. *See, e.g., Velandra*, 336 F.2d at 296–97. Although ownership of a local-operating subsidiary may not be enough for minimum contacts outside the context of alter ego or similar conceptual devices, it is nevertheless error to exclude this legitimate forum contact from consideration *in toto* with the defendant's other forum contacts in making a determination of whether the defendant has conclusively negated the propriety of exercising general jurisdiction. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir.2000) ("[A] foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to

warrant the assertion of jurisdiction over the foreign parent") (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir.1983)); *Third Nat. Bank v. WEDGE Group, Inc.*, 882 F.2d 1087, 1090 n. 1 (6th Cir.1989) ("[T]he ownership of a subsidiary that conducts business in the forum is one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts.") (internal citations omitted).

The findings of fact and conclusions of law filed in this case indicate that the trial court failed to consider ownership of the subsidiaries as a forum contact. The court found that Rockwood is a "holding company" and that its subsidiaries are "independent" and "operate day-to-day on their own." One of the findings of fact states, "Rockwood's interactions with Southern Clay, as well as with its other subsidiaries, are the ordinary and customary sorts of interactions that parent corporations have with their subsidiaries." The trial court also found that "Rockwood engages in the normal exchange associated with ownership of Southern Clay, its Texas-based subsidiary, along with other subsidiaries that maintain facilities in Texas. That normal exchange includes infrequent trips to Texas by Rockwood employees along with some business-related communications, both oral and electronic, with persons and entities in Texas."

The foregoing findings have been challenged on appeal for legal and factual sufficiency. They have also been challenged as being, in large part, improper and erroneous conclusions of law. Without going into these issues, we observe that none of the foregoing findings is in any way inconsistent with Rockwood's complete ownership of three subsidiaries with operations in Texas. In fact, the trial court's findings include statements that verify Rockwood is

the sole owner of at least three corporations operating in Texas.

These factors must be added to the *in toto* de novo review of whether minimum contacts have been negated. In doing so, we emphasize that this case involves more than simple ownership of three Texas subsidiaries. This is not a case where the only contact with Texas is ownership of stock in a Texas corporation. None of the forum contacts of Rockwood's subsidiaries need be attributed to Rockwood to demonstrate its minimum contacts within Texas. *See Freudensprung v. Offshore Tech. Servs.*, 379 F.3d 327, 346 (5th Cir.2004) ("As a general rule, ... the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated.").

Rockwood argues against this approach in its appellate brief, stating, "[N]o jurisdictional weight is [to be] given to contacts occurring as part of the normal relationship between two distinct corporations such as a parent and its subsidiaries, even where such contacts occur in Texas." Appellee's Brief p. 14. Only one case is cited for Rockwood's statement of the law. *See Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 119–20 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). In that case, which involved indirect rather than direct subsidiaries, the First Court of Appeals made the following observation about the jurisdictional separateness of parents from their subsidiaries: "[The] cases do not create a rule that, outside an alter ego situation, a parent's normal relationship with its subsidiary, pursuant to an overarching system that is not directed at any particular state, suffices to subject the parent to jurisdiction in its subsidiary's state." *Preussag*, 16 S.W.3d at 119–20.

We believe this to be an accurate statement of the law. In the only cases in which it has considered the question, the United States Supreme Court held that the activities of a subsidiary are not necessarily enough to render a parent subject to a court's jurisdiction, for service of process or otherwise. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) (citing cases including *Cannon*). Courts have interpreted this to mean that if a corporation's only contact with the forum is its ownership of a distinct and separate corporation doing business independently in the forum, no minimum contacts exist unless the forum contacts of the subsidiary can be attributed to the parent. *Freudensprung*, 379 F.3d at 346 (collecting cases).

No such theory is in play here. Even so, we do not dismiss any factor as "normal" without considering it *in toto* with the other factors. We disagree with *Preussag* insofar as the term "normal" has never been part of the due-process, personal-jurisdiction lexicon. As a yardstick of corporate amenability to suit in Texas, we find it devoid of objective utility. This is well demonstrated in the instant case, where Rockwood has employed the expression "normal relationship" as a vessel for collecting direct forum contacts and smuggling them out of the minimum contacts analysis before any due process determinations are made.

This approach undermines the state's interest in providing a judicial forum for the resolution of its civil controversies and is unduly subversive to the state's sovereignty. The Court's due process inquiry should not be commandeered through unwarranted contortions of the accepted minimum contacts nomenclature that result in the defendant's direct forum contacts being excluded from consideration *in toto* with all of the defendant's other forum

contacts in our de novo review of minimum contacts.

■ Rockwood's ownership of subsidiaries doing business in Texas amount to forum contacts, even if, standing alone, they are insufficient for the exercise of general jurisdiction. See Freudensprung, 379 F.3d at 346. Our mandate in undertaking these inquires is not to consider and reject forum contacts in isolation, but to evaluate the contacts in toto. See Holt Oil, 801 F.2d at 779; Am. Type Culture, 83 S.W.3d at 809. Accordingly, we proceed to identify Rockwood's other contacts with the forum before passing on the issue of whether general jurisdiction exists.

Another series of factors or forum contacts apparently not considered in the trial court's minimum contacts inquiry involve a written contract executed in 2001 by Michael Kenny, the then-President of Rockwood, and Vernon Sumner. The contract was submitted as evidence, and its existence and performance were verified by uncontested and uncontradicted deposition testimony, including testimony by Vernon Sumner. The contract, to which Southern Clay is not a signatory, states in part:

> We are pleased to confirm our offer of employment as President and Managing Director of our Clay Additives business on a full-time and exclusive basis. For purposes of facilitating your employment, you will be assigned to and employed by our subsidiary, Southern Clay Products, Inc. (hereafter "Southern Clay"). It is our understanding that you will commence employment on or before August 20, 2001. You will have direct reporting responsibility to the President of Rockwood Specialties, Inc. (hereinafter "Rockwood"). We reserve the right, at our discretion, to change your responsibilities or job title at any time.

In addition to a copy of the written contract, the trial court was also provided with deposition testimony regarding the parties' execution and performance of the contract. Sumner testified to the following facts in his deposition and affidavit:

> Sumner was living in Pennsylvania at the time of contracting with Rockwood and has since moved to Texas, where he has continuously maintained his residence pursuant to the contract;

> Sumner had to relocate to Texas and reside there in order to perform his contract with Rockwood;

> The contract is governed by Texas law;

> The contract makes Sumner responsible for a "basket of businesses," which Sumner identifies as the "Clay Additive business" and not simply as Southern Clay;

> Sumner's Texas office is in Austin rather than in Gonzales, where Southern Clay is located;

> Sumner's "basket of businesses" under his contract with Rockwood includes the operations of Southern Clay and Rockwood Additives, Ltd., two separate corporations for which Sumner is the managing director and "essentially" chief executive officer;

> Sumner's earnings at Rockwood Additives are consolidated with his earnings at Southern Clay, and by his decision, all of his earnings are paid by Southern Clay;

> By election, Sumner could have his earnings allocated back to Rockwood Additives for payment, but he declines to do so;

> Sumner considers Southern Clay his employer;

> Southern Clay pays Sumner's unemployment and workers' compensation premiums;

> Sumner's office is leased by Southern Clay, and Southern Clay employs all of the staff employed there. Southern

Clay pays for all of the equipment and furnishing at the office, and it pays the telephone and electricity bills;

Rockwood has limited Sumner's authority as Southern Clay president to expenditures less than $250,000. Amounts greater than this require written approval by Rockwood's president;

Rockwood has the right to change Sumner's responsibilities and job title at its discretion at any time;

Sumner is directly responsible to Seifi Ghasemi, the current president of Rockwood, and has regular contact with him;

Sumner communicates with the president of Rockwood "concerning the ongoing business activities and results of Southern Clay on average about once a month, by phone. In addition, a written monthly report is provided";

Sumner's contract with Rockwood may only be modified by an agreement in writing, singed by Sumner and an "authorized representative of Rockwood";

The contract has never been modified;

The contract has been continuously performed in Texas;

Sumner also conducts business for Rockwood Additives, Ltd. out of his Austin office;

By Sumner's estimate, he visits Southern Clay only "about once a month";

Sumner could not confirm that he had visited Southern Clay even once in the year 2002, even though at the time, he was Southern Clay's president and managing director; and

Rockwood, as the sole shareholder, annually sets performance goals for Southern Clay (and its other subsidiaries) based on the budgets prepared by each subsidiary. As President of Southern Clay, Sumner is responsible for determining and conducting the business affairs of Southern Clay in order to meet or exceed those goals.

The deposition testimony of other witnesses was also produced for the trial court's consideration on the issue of Sumner's contract with Rockwood. This evidence included testimony from Keith Stultz, the Operations Manager of Southern Clay, who runs Southern Clay's day-to-day operations. Stultz could not identify Sumner's exact job title. According to Stultz, Sumner does not have "day-today-involvement" with Southern Clay and working for Southern Clay is not Sumner's "day-to-day job." Nevertheless, Stultz testified that Sumner is the person he answers to, the person who has the "ultimate responsibility of the facility," "the ultimate responsibility for the safety program," and "the ultimate responsibility for whether or not there is adequate safety training."

Stultz was not the only high-ranking Southern Clay official who could not identify Sumner's job title. Rick Holmes, Southern Clay's Safety, Health, and Environmental Manager, also testified that he could not identify Sumner's job title, but he confirmed that no one at Southern Clay holds a higher title than Sumner.

Donna Abrunzo, an "assistant secretary" in Rockwood (and all of its subsidiaries, including Southern Clay) gave deposition testimony that Sumner is part of Rockwood's "top executive team."

The evidence also includes an inter-office memorandum by Rockwood that announces Sumner's appointment as "Managing Director of the Rockwood Clay–Additives Division and President of Southern Clay, Inc." The announcement was written by Kenny, the then-President of Rockwood, and includes statements such as "Vern joins us," "[Vern] will relocate from Pennsylvania to Texas," "Vern will report to me," and "[J]oin

me in welcoming Vern to our organization."

■ The trial court issued numerous findings of fact that failed to address the uncontested and uncontradicted evidence establishing Rockwood's continuing contractual relationship with Sumner and Rockwood's Texas forum contacts arising from that relationship:

9. Rockwood has never been a party to any contracts whereby it is obligated to perform services in Texas.

10. Rockwood has never specifically recruited residents of Texas for employment, and Rockwood has never employed any Texas residents.

13. None of Rockwood's employees lives in Texas.

39. All of Southern Clay's account and financial records are maintained at Southern Clay's facilities in Gonzales, Texas.

42. Mr. Stultz is responsible for the day-to-day operations of Southern Clay and does not report to or take direction from Rockwood with respect to the day-to-day operations of Southern Clay.

54. Vernon Sumner, the President and Managing Director of Southern Clay, is employed by Southern Clay. Mr. Sumner is not an employee of Rockwood.

55. Mr. Sumner's salary and his relocation expenses were and are paid by Southern Clay and not by Rockwood.

56. Southern Clay pays Mr. Sumner's social security taxes and withholds federal income taxes from his earnings.

57. Southern Clay pays unemployment and workers' compensation premiums on behalf of Mr. Sumner.

58. Southern Clay pays Mr. Sumner's benefits, reimburses his travel expenses and pays for his company car.

59. Mr. Sumner's office and its staff and equipment are supplied and paid for by Southern Clay.

60. Mr. Sumner is responsible for determining and conducting the business affairs of Southern Clay, and he decides how to meet various production and performance goals by consulting with Southern Clay managers and employees.

61. Rockwood does not employ any personnel that are also employed by Southern Clay.

62. Rockwood does not maintain any common facilities with Southern Clay.

The Villagomez family has raised legal and factual sufficiency challenges to most of these findings. We conclude that it is unnecessary to resolve these specific challenges individually to hold—in response to the series of objections and issues raised by the Villagomez family—that the trial court erred by neglecting to consider admitted and undisputed evidence proving that Rockwood has maintained a continuous contractual relationship with a Texas resident to perform services in Texas.

We find it noteworthy that the trial court did not issue any findings to the effect that no contract exists between Rockwood and Sumner. Its findings on this subject are limited to whether an employer-employee relationship has ever existed between Sumner and Rockwood or Sumner and Southern Clay. This is an unduly restrictive and unfair approach, given that it was accomplished without reference to any guiding rules, principles, or precedent. By focusing on the narrow

issue of a possible employer-employee relationship, the trial court obscured undisputed forum contacts that exist regardless of Rockwood's rhetorical interpretation of the evidence. Rockwood and Sumner have a contract for services that has been continuously performed in Texas. Without approving or reviewing the sufficiency of the evidence to support the trial court's finding that Sumner is employed by Southern Clay, we hold that the trial court erred by failing to consider as forum contacts Rockwood's ongoing and unmodified contract with Sumner and the performance of the contract in Texas.

Likewise, we also add to the list of forum contacts Rockwood's contacts with Southern Clay in relation to the Rockwood–Sumner contract. Southern Clay is not a signatory to the contract, but it is certainly involved in its performance. Rockwood has thus contacted and done business in Texas and with Texans by directly and purposefully providing Southern Clay with corporate leadership in Texas through the Rockwood–Sumner contract.

In adding this set of contacts to the growing list, we note that the courts have recognized that corporate formalities and "technicalities" should be considered in a due-process, personal-jurisdiction analysis. *See Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 376 (5th Cir.1978); *Smith v. Piper Aircraft Corp.*, 425 F.2d 823, 826 (5th Cir.1970). That Southern Clay is not a signatory to the contract with Sumner might be a technicality in the view of some, but if so, it is a technicality that works strongly against Rockwood. Considering Rockwood's level of sophistication and the record demonstrating its ability to structure its transactions to benefit from the laws of various jurisdictions, including those of Texas, it is significant that Rockwood elected to enter this contract in its corporate capacity rather than allowing its "independent" subsidiary to hire and manage a president through its own board of directors.

To Rockwood's credit, Riordan testified on these issues. He testified that Rockwood actually entered the contract in its capacity as sole shareholder of Southern Clay and that Mr. Kenny executed the contract as a member of Southern Clay's board of directors.

We note that the contract does not support Riordan's testimony insofar as he suggested that Southern Clay is a party to the contract: (1) the contract is on Rockwood letterhead; (2) it identifies Rockwood and Sumner as the sole parties; (3) only Rockwood's president, Mr. Kenny, signed the document for Rockwood; (4) the contract states that Mr. Kenny signed in his capacity as Rockwood's president, not in any capacity as a board member for Southern Clay; and (5) no reference is made to the shareholders or board members of Southern Clay. In addition, Sumner testified that Mr. Kenny signed the contract in his capacity as Rockwood's president and did not testify that he knew Mr. Kenny was a member of Southern Clay's board of directors.

■ Based on the admitted and uncontested evidence, a rational finder of fact could not have concluded that Rockwood attempted to structure its contacts with Sumner to avoid its corporate participation in the performance of Sumner's services in Texas. That Rockwood specifically invoked Texas law to govern its dealings with Sumner in Texas—though perhaps arguably insignificant in and of itself—further shows the purposeful nature of Rockwood's direct contacts in Texas.

■ The evidence also shows the following activities that amount to direct forum contacts:

1. Rockwood has promulgated a "Records Management Policy," which, by its terms applies to Rockwood and to all of its subsidiaries, including those with operations in Texas. The policy instructs the subsidiaries to identify, process, and retain certain records and provides a "guideline" for accomplishing this mandate, stating that "each subsidiary is responsible for establishing and maintaining its own Records Management program." The policy also states, "Records generated by or for Rockwood Specialties Inc. and/or its subsidiaries are the property of Rockwood Specialties Inc. and/or its subsidiaries rather than the individuals or the areas that generate or maintain it."

Two members of Southern Clay's management testified to Rockwood's Records Management Policy.

Sumner testified that he was familiar with the Records Management Policy and that Southern Clay has not "followed it" because he sees it, not "as a mandate," but "as guidance." When asked how Southern Clay did not follow the policy, Sumner testified, "We haven't been particularly rigorous in going back in each of the departments and auditing ourselves to make sure that we are throwing things out … on a regular basis." When questioned further on the specific parts of the policy Southern Clay did not follow, Sumner testified that Southern Clay had essentially fallen behind on "some housekeeping."

Stultz testified that the policy says what it says, but he testified that he does not know whether Southern Clay follows it. He testified that he has personally never followed it. He could not identify anyone with whom he discussed this decision, nor could he identify how he did not follow the policy.

2. Rockwood has ongoing, "arm's length" commercial transactions with Southern Clay. The record includes copies of two interest-bearing promissory notes totaling $39 million. These notes were executed in October 2001 by the board of directors of Southern Clay in their capacity as board members. Although the notes were signed with provisos stating that they could not be assigned to other holders and that New York law would govern any and all disputes, Rockwood later "cancelled" the notes and assigned them to another corporation. Southern Clay still owes the full amount of the notes.

3. Rockwood acts like a "bank" to its subsidiaries in Texas, providing "arms-length" commercial financial services totaling untold amounts.

4. Rockwood interacts directly with the directors, officers, and personnel of Southern Clay and its other Texas subsidiaries through its incentive bonus plan and provision of group health insurance.

5. Rockwood has an ongoing contract with Health First, a separate corporation doing business in Texas. Donna Abrunzo entered into an agreement, on January 1, 2003, on behalf of Rockwood with Health First, a third-party administrator located in Tyler, Texas. The contract states that Rockwood is organized under Texas law. Although Abrunzo testified that the contract is inaccurate in that regard, she confirmed it was executed with the inaccuracy. The contract indicates that it will be performed in Texas. The evidence shows that the services performed in

Texas by Health First at Rockwood's direction were also directed to benefit persons connected to Rockwood's subsidiaries, including those subsidiaries operating in Texas.

6. Rockwood has commissioned property conservation studies and surveys with third-party corporations in Texas which have occurred in Texas for the benefit of its Texas subsidiaries, including Southern Clay. These studies have dealt with numerous issues, including risk assessment and management.

7. Rockwood sends employees, often including Mike Piacentino, Rockwood's Director of Environmental, Risk, and Safety Management, to Texas to assist its subsidiaries in material, non-financial issues specific to their individual Texas locations and operations, such as passing safety audits and dealing with federal regulatory agencies such as OSHA and MSHA. This happened in 2001, 2002, and 2003.

8. In 2002, Rockwood contracted with Hartford Steam Boiler Inspection and Insurance Co., which maintains an office in Houston, Texas. At Rockwood's direction, Hartford Steam performed internal inspections of three high-pressure fire tube boilers located at Southern Clay's facility in Gonzales, Texas.

9. Rockwood contracted with Royal Sun Alliance to perform boiler inspections which occurred at Southern Clay's facility on December 21, 2001.

10. Rockwood's employee, Mike Piacentino, has participated, at the sole direction of Rockwood, in multiple investigations following accidents involving the injury or death of Texas residents at Southern Clay in the years 2001 and 2003. In one investigation, Piacentino was designated the "team leader."

11. Acting as Rockwood's employee, Piacentino helped Southern Clay, MSHA officials, and others recreate accidents involving the injury or death of Texas residents at Southern Clay in the years 2001 and 2003.

12. Acting as Rockwood's employee, Piacentino authored reports of accidents involving the injury or death of Texas residents which Southern Clay filed with MSHA in the years 2001 and 2003.

13. Acting as Rockwood's employee, Piacentino performed a "Process Hazards Audit" at Southern Clay's facility in Texas in the years 2001 and 2002.

14. Although Piacentino is an employee of Rockwood and not Southern Clay, his name and his work and mobile phone numbers are listed as "Southern Clay Products Contacts" on Southern Clay's "Emergency Numbers," which is included in the Southern Clay Products Safety Manual. Employees of Southern Clay are given copies of the manual and are trained on it.

15. According to Rockwood executive and counsel Tom Riordan, "[F]rom a safety standpoint, Mr. Piacantino is essentially monitoring safety [at the subsidiaries in Texas] on behalf of the holding company [Rockwood]."

16. Rockwood provides each of its subsidiaries, including those in Texas, with a mandatory Safety, Health, and Environment ("SHE") Management Program

Guidance Manual, which includes, among other things, reporting schedules for the subsidiaries to use in making their routine communications with Rockwood.

17. Rockwood's SHE guidelines are mandatory, but they give Rockwood subsidiaries latitude to create their own policies and programs to meet or exceed the expectations set by Rockwood.

18. Rockwood's employee, Piacentino, has regular and scheduled contact, communication, and correspondence with Rockwood's various subsidiaries, including those in Texas, on issues related to Rockwood's SHE guidelines and the subsidiaries' programs and performance related to the SHE guidelines.

19. From November 27, 2000, when Rockwood was created, until the time of suit in 2003, Rockwood officers and employees, including its Chairman and CEO and Vice President and CFO, among others, made trips to Texas at least 23 times.

20. Seventeen of the visits were for "business," to use Rockwood's description, or for reasons that appear to be business related (for instance, one of the reasons listed is a "global sales meeting").

21. Rockwood's former President, Mr. Kenny, made trips to Texas in 2001 and 2002. According, to Rockwood, the trips were for "unknown" reasons. There is no indication in the record that the trips were for personal affairs. The records produced by Rockwood show the trips listed along side four other trips Mr. Kenny made to Texas in 2001 and 2002 that are business related.

### 2. Minimum Contacts Analysis

■ Jurisdiction depends upon the facts of each case. *See, e.g., People's Tobacco Co. v. American Tobacco Co.,* 246 U.S. 79, 86–87, 38 S.Ct. 233, 62 L.Ed. 587 (1918). In passing on the merits of the above-mentioned factors as evidence of a substantial connection for minimum contacts, we are heavily influenced by how Learned Hand described general corporate forum contacts more than a lifetime ago:

It scarcely advances the argument to say that a corporation must be "present" in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered. Indeed, it is doubtful whether it helps much in any event. It is difficult, to us it seems impossible, to impute the idea of locality to a corporation, except by virtue of those acts which realize its purposes. The shareholders, officers and agents are not individually the corporation, and do not carry it with them in all their legal transactions. It is only when engaged upon its affairs that they can be said to represent it, and we can see no qualitative distinction between one part of its doings and another, so they carry out the common plan. If we are to attribute locality to it at all, it must be equally present wherever any part of its work goes on, as much in the little as in the great.

When we say, therefore, that a corporation may be sued only where it is "present," we understand that the word is used, not literally, but as shorthand for something else.

*Hutchinson v. Chase & Gilbert,* 45 F.2d 139, 141 (2d Cir.1930).

In doing so, we are also following the precedent of the United States Supreme Court:

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, *Klein v. Board of Supervisors*, 282 U.S. 19, 24, 51 S.Ct. 15, 75 L.Ed. 140, it is clear that unlike an individual its "presence" without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it. To say that the corporation is so far "present" there as to satisfy due process requirements, for purposes of taxation or the maintenance of suits against it in the courts of the state, is to beg the question to be decided. For the terms "present" or "presence" are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process. L. Hand, J., in *Hutchinson v. Chase & Gilbert*, 45 F.2d 139, 141. Those demands may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.

*International Shoe*, 326 U.S. at 316–17, 66 S.Ct. 154.

■ Having reviewed Rockwood's Texas forum contacts *in toto*, we are satisfied that there is enough for minimum contacts. As a holding company, Rockwood's business is very specialized. Rockwood has no traditional "operations," nor is it supposed to. Holding companies generally do not exist to provide goods or services; rather, they exist to hold controlling equity interests in other entities (*e.g.*, stock in other corporations), which may or may not provide goods or services of their own.

Although Rockwood is a holding company, the admitted and undisputed evidence shows that Rockwood does more than merely "hold" stock. Rockwood conducts business in Texas by owning other businesses in Texas and by directly facilitating the profitability of such businesses through myriad integrated systems of commercial transactions, finance, communication, executive oversight, safety, and corporate accountability, to give a non-exhaustive list. This business often involves the physical presence of Rockwood's personnel in Texas.

The connection between Rockwood and its Texas subsidiaries, including Southern Clay, is substantial in this regard, but their corporate identities remain distinct. Insofar as the day-to-day operations of subsidiaries such as Southern Clay are concerned, the record shows that it is the subsidiaries themselves that run the businesses, not Rockwood. For instance, the person actually running Southern Clay's day-to-day operations is Keith Stultz, not Vernon Sumner. Stultz is a long-time employee of Southern Clay and has no employment history with Rockwood or its predecessor corporation Laporte, which previously owned Southern Clay and employed Mike Piacentino, Tom Riordan, and others who now work for Rockwood.[1]

---

1. Rockwood has proceeded through its special appearance with the apparent understanding that its jurisdictional forum contacts with Texas are not to include the forum contacts of the corporation from which Rockwood directly succeeded. We question whether this is proper. As the Seventh Circuit recently noted:

 > [S]everal courts have recognized that the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process. *See Patin v. Thoroughbred Power Boats Inc.*,

Nevertheless, the admitted and uncontested evidence establishes that Sumner is the highest ranking official at Southern Clay and that Southern Clay's top management is accountable to Sumner for the day-to-day operations of the business. Sumner also uses his office in Austin to serve as president and managing director of a second corporation called Rockwood Additives, Ltd., which is located in the United Kingdom. Sumner is directly accountable to Rockwood, both in practice and by written agreement. No evidence of any written agreement between Sumner and Southern Clay or its board of directors has been produced by Rockwood, though Rockwood has long contended that Sumner is Southern Clay's employee. Regardless of whether that assertion is ultimately true or false, the fact remains that Rockwood has failed to adequately address its ongoing contractual relationship with Sumner for services Sumner provides in Texas under Texas law.

Furthermore, Sumner's services for Rockwood are no paltry matter of shipping odd materials or corresponding by mail. They go to the heart of Rockwood's business. In contracting directly with Sumner to make Sumner ultimately accountable for the profitability of Southern Clay's business in Texas but giving Sumner no day-to-day function at Southern Clay, Rockwood extended directly into Texas its business of owning other businesses and directly facilitating their profitability.

This Court should not disregard corporate formalities to defeat general jurisdiction. *See Bearry,* 818 F.2d at 376; *Smith,* 425 F.2d at 826. Rockwood could have severed its connection with Texas by having Sumner contract with Southern Clay and report directly to Southern Clay's board of directors; yet, Rockwood chose to enter Texas to contract and interact with Sumner directly in its corporate capacity as Rockwood, not from behind the veil of Southern Clay's board of directors.

The above-listed contacts demonstrate that Rockwood has purposefully availed itself of the privilege of conducting activities within Texas in its corporate capacity, rather than merely through its subsidiaries. *See Asahi,* 480 U.S. at 109, 107 S.Ct. 1026. Rockwood's activities have created a substantial connection with Texas. *See id.* Accordingly, we conclude that Rockwood purposefully established the minimum contacts necessary to be amendable to suit in Texas. *See Michiana,* 168 S.W.3d at 787 ("Certainly a nonresident corporation ought to be subject to suit in any jurisdiction where it 'enjoys the benefits and protection of the laws of that state.'").

294 F.3d 640, 654 (5th Cir.2002) ("[A] successor corporation that is deemed to be a 'mere continuation' of its predecessor corporation can be bound by the predecessor corporation's voluntary submission to the personal jurisdiction of a court."); *Williams v. Bowman Livestock Equip. Co.,* 927 F.2d 1128, 1131 (10th Cir.1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."). The Fifth Circuit in *Patin* explained that the rationale for such a rule is that, because the two corporations "are the same entity, the jurisdictional contacts of one are the jurisdictional contacts

of the other for the purposes of the *International Shoe* due process analysis." *Patin,* 294 F.3d at 653.

*Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 783–84 (7th Cir.2003) (s omitted).

Given that the burden is on Rockwood to negate all bases for jurisdiction, *see BMC Software,* 83 S.W.3d at 793, and considering the admitted and undisputed evidence showing that Rockwood succeeded from a corporation that had direct Texas forum contacts, we conclude that Laport's forum contacts should have been addressed by Rockwood.

## B. Fair Play and Substantial Justice

 Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Asahi,* 480 U.S. at 113–15, 107 S.Ct. 1026. These factors include (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies. *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559; *Asahi,* 480 U.S. at 113, 107 S.Ct. 1026. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. The opposite may also be true. That is, even if the nonresident defendant has purposely established minimum contacts with the forum state, the exercise of jurisdiction may not be fair and reasonable under the facts in a particular case. *Burger King,* 471 U.S. at 477–78, 105 S.Ct. 2174.

 Rockwood's brief to the trial court in support of its special appearance included a paragraph of arguments on the five factors enumerated above. The paragraph contains no citation to authorities or evidence, but we will nevertheless address the points raised. Among other things, Rockwood argued that the exercise of personal jurisdiction in this case would be repugnant to notions of fair play and substantial justice because it "maintains no offices or employees in Texas, and any witnesses Rockwood would call to trial reside in New Jersey." We find the first part of this argument particularly unpersuasive because the same or similar could be said of virtually all nonresident defendants being haled into state court. As a national corporation with ongoing and pervasive contacts with Texas, Rockwood is especially well suited for this type of out-of-state litigation. We therefore conclude that the first factor does not militate in any meaningful respect towards a conclusion that maintenance of the suit in Texas would offend notions of fair play and substantial justice. *See World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559.

Rockwood also argued before the trial court that the "interests of Texas are not served by calling Rockwood to court in Texas. In fact, the inclusion of Rockwood as a defendant is little more than an effort to subvert Texas workers' compensation law by naming a defendant that is not protected from negligence claims by the workers' compensation scheme." Although the foregoing argument is ostensibly based on Rockwood's aversion to suit, part of it does speak to the interests of the forum state in adjudicating the dispute. *See id.* To the extent the second factor is implicated by the argument, we conclude that Texas has a strong sovereign interest in providing a forum for lawsuits that seek to hold out-of-state corporations accountable for wrongful deaths that they cause in Texas. That Southern Clay may be liable for the same death but in the capacity of an employer rather than a third party only serves to strengthen the state's interest in providing a single forum to resolve such controversies. The second factor therefore militates strongly in favor of the Villagomez family and maintenance of their suit in Texas.

Rockwood also argued that "the plaintiffs' interest in obtaining relief may be

fully served by its [sic] suit against Southern Clay, without the necessity of joining Rockwood." Given that no authority, evidence, or argument was advanced in support of this statement, we can only surmise that it is no more than a rhetorical point premised largely on a procedurally untenable presumption that Rockwood is not culpable for Mr. Villagomez's death. At this early stage of the proceedings, the merits of this case should not be litigated or presumed in Rockwood's favor simply to defeat the court's otherwise constitutional exercise of personal jurisdiction over a nonresident corporation.

Finally, Rockwood argued that "[a]s for the last two considerations, system efficiency and furtherance of social policies are both served by declining to exercise personal jurisdiction over Rockwood." Again, the legal underpinnings of these arguments have gone undeveloped by Rockwood.

For these reasons, we conclude that Rockwood did not establish that maintenance of this suit in Texas would offend notions of fair play and substantial justice.

## IV. Conclusion

The trial court erred by granting the special appearance because Rockwood failed to negate the existence of general jurisdiction. Without addressing specific jurisdiction, we reverse the court's order and remand for further proceeding consistent with this opinion.

Dissenting Opinion by Justice
ERRLINDA CASTILLO.

Dissenting Opinion by Justice
CASTILLO.

Because I would affirm the trial court's order sustaining the special appearance of appellee, Rockwood Specialties, Inc. ("Rockwood"), I respectfully dissent.

## I. Background

The underlying suit was brought following an incident that occurred on February 11, 2003, at Southern Clay Products, Inc. ("Southern Clay"), located in Gonzales, Texas. Ismael Villagomez, an employee of Southern Clay, was performing work inside an empty mixing tank when a large quantity of steam was released into the tank, severely burning him and resulting in his death. Suit was brought on March 13, 2003, by appellants, Lucy Villagomez, Individually, and as Representative of the Estate of Ismael Villagomez, Deceased, and Francisco and Maria Villagomez (collectively "Villagomez"). Claims were brought under the Texas wrongful death statute and under the survival act.

Southern Clay, a Texas corporation in business since the early 1950s, is a subscriber under the Texas Workers' Compensation Act. Southern Clay was an independent company until 1991, when it was purchased by Laporte, Inc. In 2000, Laporte, Inc., was acquired by Rockwood. Southern Clay is now a wholly owned subsidiary of Rockwood, a Delaware corporation with headquarters in New Jersey.

Villagomez alleges that Rockwood is independently negligent for affirmative acts and omissions, and that it voluntarily undertook to perform services "it knew or should have known were necessary for the protection of Ismael Villagomez and failed to exercise reasonable care in performing those services." Villagomez alleges that Southern Clay relied on Rockwood for the performance of those services, and that performance increased the risk of harm to Ismael Villagomez.

Rockwood filed a special appearance, urging that it has no connections or interactions with the State of Texas sufficient to bring it within the jurisdiction of a Texas court. The parties undertook con-

siderable discovery on this jurisdictional question, including six depositions at which numerous documents were tendered as exhibits. Extensive evidence and briefing was submitted to the trial court.

A hearing on the special appearance was held March 28, 2005.[1] On May 5, 2005, the trial court forwarded a letter to counsel stating:

I have reviewed completely the deposition excerpts, affidavits (and objections thereto) and all of the evidence admitted before the court, as well as the briefs of the parties and conducted my own research. Thanks to all counsel for a well-presented and well-argued motion.

It is the opinion of the Court that the Court does not have either general or special jurisdiction over Rockwood Specialties, Inc. and that the Special Appearance of Rockwood Specialities, Inc. should be SUSTAINED.

The court requested that an order to that effect be submitted. In a formal order dated May 24, 2005, the trial court sustained Rockwood's special appearance, finding it had neither specific nor general jurisdiction over Rockwood.[2] Extensive findings of fact and conclusions of law were issued by the trial court on June 17, 2005. This interlocutory appeal ensued.

## II. Jurisdictional Facts in Issue

In its special appearance and its later supporting briefs, Rockwood tendered evidence to show that it is only a holding company with no operations of its own. It owns the stock of thirteen separately maintained subsidiary companies, one of which is Southern Clay. Rockwood briefed and tendered evidence to support its position that (1) it has never done business in Texas, (2) has no offices or agents and is not registered to do business in Texas, (3) owns no real or personal property in Texas, (4) maintains no bank or other financial accounts in Texas, (5) has no employees in Texas, (6) does not target business in Texas, either by mail or through its website, and (7) only makes visits to its Texas subsidiary to ensure operations are within budget and to determine if other material issues exist of which it, as sole shareholder, needs to be aware. Rockwood tendered extensive evidence to show it never undertook to ensure the safety of Southern Clay employees and that its only contacts with Southern Clay were those normal interactions between a parent and its subsidiary. Rockwood also urged that traditional notions of fair play and substantial justice would be offended by asserting jurisdiction over it.

Evidence tendered by Rockwood included the following: (1) deposition testimony and the affidavit of Thomas Riordan, Vice President in Law and Administration for Rockwood; (2) deposition testimony and the affidavit of Michael Piacentino, the Director of Environmental, Safety and Risk Management for Rockwood; (3) deposition testimony of Donna Abrunzo, a paralegal and Director of Administration for Rockwood; (4) deposition testimony and the affidavit of Vernon Sumner, President of

1. At the hearing, the parties tendered their respective exhibits and deposition testimony, as well as objections to affidavits. The parties presented argument, and all was taken under advisement by the trial court.

2. That same date, the trial court issued rulings on Villagomez's objections to deposition and affidavit testimony tendered by Rockwood in support of its special appearance.

The objections and the rulings thereon specifically itemize the language in the question and the basis for the objection. Of the twenty-one objections to deposition testimony, all but three are overruled. Of the twelve objections to affidavit testimony, all but one are overruled. No issues are raised in this appeal relating to any of these objections.

Southern Clay; (5) deposition testimony of Richard Holmes, Manager of Safety Health and Environmental Systems at Southern Clay; (6) the employee agreement between Ismael Villagomez and Southern Clay; and (7) deposition testimony and the affidavit of Keith Stultz, the Operations Manager at Southern Clay.

Villagomez contends that the evidence establishes that (a) Sumner, president of Southern Clay, is in reality an employee of Rockwood, living and performing services in Texas; (b) Rockwood issued a mandatory Safety, Health and Environmental ("SHE") Manual that prescribes safety policy for its subsidiaries; and (c) Rockwood has conducted numerous inspections and performed safety training at Southern Clay in Texas. Villagomez further urges that Rockwood owns property in Texas (i.e., the business records of Southern Clay), and that Rockwood has entered into other contracts with entities in Texas, thereby subjecting itself to the jurisdiction of Texas courts.

Villagomez submitted documentary evidence, including the following: [3] (1) information from Rockwood's website; (2) Rockwood's "SHE Management Program Guidance Manual," as well as excerpts from that manual including a sample guide for investigating a major incident; (3) summary of annual SHE performance at Southern Clay, dated September 2002; (4) a clay additives SHE Divisions summary report dated January 2001; (5) Rockwood SHE reports for January and May 2001, authored by Mike Piacentino; (6) an itemized listing and copies of itineraries for visits made by Rockwood personnel to Texas between November 2000 and March 2005, including the purposes therefor; (7) the Mine Safety and Health Administration ("MSHA") report and investigation

materials for a May 2001 accident at Southern Clay; (8) the MSHA report and investigation materials for the February 2003 accident at Southern Clay that involved Villagomez; (9) copies of Southern Clay's internal investigative reports from the 2001 and 2003 incidents; (10) Southern Clay's letter to MSHA objecting to the MSHA report of the January 22, 2003 incident; (11) Southern Clay hazard and near-miss reports; (12) various e-mail communications between Southern Clay and Rockwood personnel; (13) various reports submitted by Southern Clay to Rockwood's risk management department; (14) sample copies of Southern Clay self-audits; (15) documents providing authority from Rockwood to Southern Clay to borrow monies and associated loan documents (reflecting loan from Rockwood to Southern Clay); (16) property conservation report, prepared on behalf of Rockwood's risk management department, relating to Southern Clay's work site; (17) Rockwood's administrative services agreement with a Texas corporation, HealthFirst (a third party administrator for benefits); (18) Rockwood's records management policy; (19) the employment contract with Southern Clay's president, Vernon Sumner and Rockwood's announcement of his appointment as president; (21) a listing of emergency contact numbers posted at Southern Clay which includes the contact number for Rockwood's Mike Piacentino; (22) Southern Clay's safety policy and its confined space entry procedure; (23) loss control reports prepared by a third party for Southern Clay, relating to boiler examination in December 2001; and (24) Villagomez's employment agreement with Southern Clay (executed at time when parent company was Laporte, Inc.). Villagomez also provided deposition testimony of

---

**3.** This listing is not all-inclusive. Rockwood agreed not to object to the Villagomez's evidence for the purposes of the hearing on jurisdiction only.

Donna Abunzo, Michael Piacentino, Thomas Riordan, Vernon Sumner, and Keith Stultz in support of its contention that Rockwood's special appearance should be denied.

Rockwood's contentions were largely adopted by and reflected in the findings of fact issued by the trial court.[4] The trial court also issued conclusions of law which reflect: (1) Rockwood has insufficient minimum contacts with Texas to support the exercise of general jurisdiction, and the court has no personal jurisdiction over it; (2) facts do not support that Rockwood has a "general presence" in Texas; (3) Villagomez did not plead alter ego and, therefore, that theory cannot support jurisdiction; (4) even if alter ego had been alleged, Villagomez has not sustained its burden to show that Rockwood exercises control over the business operations and affairs of Southern Clay to an extent greater than that normally associated with common ownership; (5) Villagomez did not plead or prove any theory of "joint enterprise," and disavows any reliance on that theory; (6) even if "joint enterprise" were available, facts do not support its application;[5] (7) Villagomez's causes of action do not relate to or arise out of any action or failure of Rockwood to act in Texas; (8) Rockwood has sustained its burden to demonstrate that specific jurisdiction does not exist in this case; (9) with respect to a negligent undertaking theory, Rockwood conducted no inspections of the specific equipment involved in the incident, and Southern Clay neither relied upon Rockwood for safety nor upon its guidelines with respect to Southern Clay's safety programs; (10) Rockwood has not undertaken to ensure the safety of the employees of Southern Clay, and jurisdiction may not be exercised on that theory; and (11) Rockwood has insufficient minimum contacts with Texas to support the exercise of personal jurisdiction.

## III. ISSUES ON APPEAL

Villagomez raises seven issues on appeal: (1) did the trial court err in sustaining the special appearance; (2) did Rockwood satisfy its burden to negate all possible bases for personal jurisdiction; is the evidence (3) legally sufficient and (4) factually sufficient to sustain the findings of fact and conclusions of law; (5) are Rockwood's contacts with Texas sufficient to establish general jurisdiction or (6) specific jurisdiction; and (7) did the trial court misplace the burden of proof for a special appearance.

## IV. STANDARD OF REVIEW

Whether a court has personal jurisdiction over a nonresident defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). However, the trial court frequently resolves questions of fact before deciding the jurisdictional question. *Id.* If a trial court enters an order on a special appearance and also issues findings of fact and conclusions of law, a party may challenge the fact findings on legal and factual sufficiency grounds. *Id.* Unchallenged fact findings are binding on the appellate court. *Hotel Partners v. KPMG Peat*

---

**4.** Rockwood submitted 67 proposed findings of fact and 14 proposed conclusions of law to the trial court; Villagomez submitted objections to those proposals and proposed alternative findings of fact and conclusions of law. The trial court issued 65 findings of fact and 11 conclusions of law, substantially similar to Rockwood's submissions.

**5.** Villagomez did not plead alter ego, single business enterprise, or joint enterprise. Villagomez consistently alleges only that Rockwood's direct acts in and contacts with Texas are sufficient to subject it to jurisdiction in a Texas court.

*Marwick,* 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied). We conduct a *de novo* review when applying the law to the facts. *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V.,* 82 S.W.3d 622, 622 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (op. on rehearing) (en banc). If an order on a special appearance is based on undisputed or otherwise established facts, such as where the nonresident defendant does not challenge the trial court's findings of fact, the exercise of personal jurisdiction is a question of law we review de novo. *Happy Indus. Corp. v. Am. Specialties, Inc.,* 983 S.W.2d 844, 848 (Tex.App.-Corpus Christi 1998, pet. dism'd w.o.j.).

A trial court's conclusions of law are not binding on this Court, and we are free to make our own legal conclusions. *Harlingen Irrigation Dist. Cameron County No. 1 v. Caprock Communications Corp.,* 49 S.W.3d 520, 530 (Tex.App.-Corpus Christi 2001, pet. denied); *Muller v. Nelson Sherrod & Carter,* 563 S.W.2d 697, 701 (Tex. Civ.App.-Fort Worth 1978, no writ). When we conduct our de novo review of conclusions of law, the judgment will be upheld if it can be sustained on any legal theory supported by the evidence. *Harlingen Irrigation Dist.,* 49 S.W.3d at 530 (citing *Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.,* 981 S.W.2d 483, 485 (Tex.App.-Austin 1998, no pet.)). A trial court's conclusions of law may not be reviewed for factual sufficiency and may be reversed only if they are erroneous as a matter of law. *Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex.App.-Austin 1999, pet. denied); *Hofland v. Fireman's Fund Ins. Co.,* 907 S.W.2d 597, 599 (Tex.App.-Corpus Christi 1995, no writ). Incorrect conclusions of law do not require reversal, provided that the controlling findings of fact support a correct legal theory. *Stable Energy,* 999 S.W.2d at 547.

A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's finding. *Anderson v. Seven Points,* 806 S.W.2d 791, 794 (Tex.1991); *see also Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996). When reviewing facts, the

> ... final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We are to review the evidence "in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have disbelieved." *Ysleta Indep. Sch. Dist. v. Monarrez,* 177 S.W.3d 915, 917 (Tex.2005) (per curiam). If the evidence presented at trial would permit reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Keller,* 168 S.W.3d at 822. The trier-of-fact, whether the trial court or the jury, remains the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. It may choose to believe one witness and disbelieve another, and a reviewing court cannot impose its own opinions to the contrary. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable dis-

agreement." *Id.* "[T]he court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.*

When reviewing factual insufficiency complaints, this Court considers, weighs and examines all evidence which supports or undermines the finding. *See Golden Eagle Archery v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). The finding is set aside only if the evidence standing alone is too weak to support the finding or the finding is so against the overwhelming weight of the evidence as to manifestly unjust and clearly wrong. *Id.*

## V. PERSONAL JURISDICTION

### A. Minimum Contacts with the Forum State

Texas courts may assert personal jurisdiction over a nonresident defendant only if such jurisdiction is authorized by the Texas long-arm statute, and is consistent with federal and state standards of due process. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.001–17.093 (Vernon 1997 and Vernon Supp.2006); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). The Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow." *Coleman,* 83 S.W.3d at 806 (citing *Guardian Royal,* 815 S.W.2d at 226). The statute lists particular acts that constitute "doing business," but also provides that "other acts" of the nonresident may place him within the "doing business" requirement. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

Jurisdiction is proper if a nonresident defendant has established "minimum contacts" with Texas and maintenance of the suit will not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The purpose of minimum contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction. *Coleman,* 83 S.W.3d at 806; *Schlobohm,* 784 S.W.2d at 357. Focus is therefore upon the defendant's activities and expectations. *Coleman,* 83 S.W.3d at 806. This analysis requires that the defendant "purposefully avail" itself of the privilege of conducting activities in Texas, thus invoking the benefits and protections of Texas laws, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), such that the defendant could reasonably anticipate being called into a Texas court. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Coleman,* 83 S.W.3d at 806. Jurisdiction will not attach if contacts are random, fortuitous, or attenuated. *Id., Guardian Royal,* 815 S.W.2d at 226. The quality and nature of the contacts, rather than their number, are the focus of this analysis. *Coleman,* 83 S.W.3d at 806; *Guardian Royal,* 815 S.W.2d at 230 n. 11.

For half a century, the touchstone of jurisdictional due process has been "purposeful availment." Since *Hanson v. Denckla,* "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Three aspects of this requirement are relevant here. First, it is only the defendant's contacts with the forum that count: purposeful availment "ensures that a defen-

dant will not be haled into a jurisdiction solely as a result of ... the 'unilateral activity of another party or a third person.' " Second, the acts relied on must be "purposeful" rather than fortuitous. Sellers who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to the jurisdiction of the latter in suits based on their activities. By contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784–85 (Tex.2005) (citations omitted).

## B. Specific Jurisdiction

A nonresident defendant's minimum contacts with Texas may confer either general or specific jurisdiction. *BMC,* 83 S.W.3d at 795. In conducting specific jurisdiction analysis, focus is on the relationship between Rockwood, the state of Texas, and the litigation. *Guardian Royal,* 815 S.W.2d at 228. Activities of the defendant in the forum may be isolated or disjointed, but where the cause of action in issue arises from a particular activity, jurisdiction attaches and is said to be specific. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *BMC,* 83 S.W.3d at 796 (citing *Schlobohm,* 784 S.W.2d at 357). Even a single act or event, if it creates or gives rise to the plaintiff's cause of action, may constitute sufficient minimum contacts to support the exercise of specific jurisdiction. *Burger King,* 471 U.S. at 476 n. 18, 105 S.Ct. 2174; *Ahadi v. Ahadi,* 61 S.W.3d 714, 719 (Tex App.-Corpus Christi 2001, pet. denied). This requirement for a "substantial connection" between the plaintiff's cause of action and the defendant's contacts means that those contacts, both with the litigation and the forum, must be meaningful, not "random, fortuitous, or attenuated." *Ahadi,* 61 S.W.3d at 719. The substantial connection between the nonresident defendant and the forum state necessary for a finding of minimum contacts must come about by action or conduct of the nonresident defendant purposefully directed toward the forum state. *Guardian Royal,* 815 S.W.2d at 226. An element of foreseeability is also implicit in the "substantial connection" requirement; a nonresident defendant should be able to reasonably predict that it may be subject to personal jurisdiction in the forum state. *Ahadi,* 61 S.W.3d at 719–20. However, "foreseeability" is not necessarily determinative when considering whether the nonresident defendant purposefully established "minimum contacts" with the forum state. *Guardian Royal,* 815 S.W.2d at 227.

## C. General Jurisdiction

Where the defendant's activities in the forum are continuing and systematic, jurisdiction may be proper without a relationship between the defendant's particular act and the cause of action in issue. In these cases, jurisdiction is said to be general. *BMC,* 83 S.W.3d at 796; *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm,* 784 S.W.2d at 357. "General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction." *BMC,* 83 S.W.3d at 797 (citing *CSR, Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (orig. proceeding); *Guardian Royal,* 815 S.W.2d at 228). A nonresident must have conducted more substantial activity in the forum state for the state to exercise general jurisdiction than for it to exercise specific jurisdiction. *CSR,* 925 S.W.2d at 595.

## D. The Burden of Proof

While a plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the long-arm statute, *Coleman*, 83 S.W.3d at 807 (citing *McKanna v. Edgar*, 388 S.W.2d 927, 930 (Tex.1965)), upon the filing of a special appearance the nonresident defendant assumes the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *Coleman*, 83 S.W.3d at 807; *CSR*, 925 S.W.2d at 596; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985) (per curiam). In the absence of sufficient jurisdictional allegations by the plaintiff, the defendant meets its burden of negating all potential bases of jurisdiction by presenting evidence that it is a nonresident. *M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 n. 2 (Tex.App.-Corpus Christi 1999, no pet.); *KPMG*, 847 S.W.2d at 634.

## VI. ANALYSIS

This is not an instance where jurisdiction may arise based upon the placement of a particular product into the stream of commerce. Rather, Villagomez alleges that both specific and general jurisdiction exist, based principally upon (1) the existence of an employee of Rockwood living in Texas; (2) Rockwood's undertaking to provide safety services to Southern Clay employees, including the provision of allegedly mandatory safety policies, and the sending of Rockwood employees to Texas to conduct business, conduct safety inspections and safety training; (3) the maintenance of Rockwood property in Texas (i.e., the business records of Southern Clay); and (4) Rockwood's entry into various contracts with other entities in Texas.

## A. The Burden of Proof Issues

Villagomez alleges in its second issue that Rockwood failed to satisfy its burden to negate all possible bases for personal jurisdiction. In its seventh issue, Villagomez alleges that the trial court misplaced the burden of proof for a special appearance.

As previously noted, Rockwood bore the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *Coleman*, 83 S.W.3d at 807; *CSR*, 925 S.W.2d at 596; *Middleton*, 699 S.W.2d at 203. Absent specific jurisdictional allegations, it meets its burden of negating all potential bases of jurisdiction by presenting evidence that it is a nonresident. *M.G.M. Grand*, 8 S.W.3d at 408 n. 2; *KPMG*, 847 S.W.2d at 634. In its petition, Villagomez made the following specific allegations:

> Rockwood conducts business in Texas by maintaining an employee in Texas and generally conducting business in Texas. In addition, Rockwood voluntarily undertook to perform services in Texas that it knew or should have known were necessary for the protection of residents of Texas.

The findings of fact and conclusions of law issued by the trial court reflect the proper allocation of the burden of proof. They state that "Rockwood has sustained its burden of demonstrating that it does not have sufficient minimum contacts with the State of Texas to support the exercise of general jurisdiction over it." Villagomez obviously disagrees with the trial court's evaluation of the facts and the conclusions to be drawn from them, and essentially argues that the only way it could have concluded as it did was to reverse the burden of proof.[6]

---

**6.** I note the conclusions of law which related to Villagomez's failure to sustain its burden of "proving facts to support the theor[ies of alter ego and joint enterprise] as a basis for jurisdiction," whether or not appropriate at this stage, are unnecessary to any ultimate conclu-

I would conclude from the evidence tendered by each of the parties that the burden of proof was not improperly allocated and remained, at all times, upon Rockwood as the party opposing jurisdiction. The record reflects that Rockwood did tender evidence directed to rebutting the specific allegations of jurisdiction raised by Villagomez, as well as evidence to negate all possible bases for jurisdiction.

Villagomez's remaining issues all deal with the sufficiency of the evidence to support the trial court's finding as to special and general jurisdiction, such that the trial court erred in sustaining the special appearance. I address the weight and merits of that evidence below.

### B. Specific Jurisdiction

As noted above, where the cause of action in issue arises from a particular activity, jurisdiction attaches and is said to be specific. *Helicopteros Nacionales,* 466 U.S. at 414 n. 8, 104 S.Ct. 1868; *BMC,* 83 S.W.3d at 796; *Schlobohm,* 784 S.W.2d at 357. Even a single act or event, if it creates or gives rise to the plaintiff's cause of action, may therefore constitute a sufficient minimum contact. *Burger King,* 471 U.S. at 476 n. 18, 105 S.Ct. 2174; *Ahadi,* 61 S.W.3d at 719. A "substantial connection" must exist between the plaintiff's cause of action and the defendant's contacts, and the contacts must be meaningful, not "random, fortuitous, or attenuated." *Ahadi,* 61 S.W.3d at 719.

### 1. The Employment Status of Sumner

Villagomez alleges that Southern Clay's president was actually an employee of Rockwood and not Southern Clay. The employment agreement reflects Sumner was indeed hired by Rockwood, but that he was "assigned to and employed by our subsidiary, Southern Clay." He did report directly to Rockwood's president. Sumner did participate in Rockwood's executive bonus plan. Villagomez alleged that by virtue of Sumner's presence in Texas as an employee of Rockwood, Rockwood maintained a place of business in Texas. It also cited to the need for Sumner to clear all expenditure requests for Southern Clay in excess of $250,000 with its parent company.

Other evidence reflects that all Sumner's salaries and bonuses are paid by Southern Clay, all his benefits, including all insurances, workers' compensation and unemployment benefits, travel expenses, and company car, are paid for and provided by Southern Clay, all taxes are withheld and paid by Southern Clay, his office, staff, and equipment are supplied and paid for by Southern Clay, and he is responsible for the business affairs of Southern Clay.

It is common for the parent of a wholly-owned subsidiary to exercise exclusive authority over the hiring and firing of the subsidiary's officers. *Zamarron v. Shinko Wire Co., Ltd.,* 125 S.W.3d 132, 142 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (holding that jurisdiction over the non-resident parent corporation did not attach and that the parent's complete authority over general policy decisions of the subsidiary, including hiring and firing of officers and approval of sizable capital investments, is insufficient to show control over the internal business operations and affairs of the subsidiary for jurisdictional purposes); *see also Dunn v. A/S Em. Z. Svitzer,* 885 F.Supp. 980, 988 (S.D.Tex. 1995) (holding that a parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is pres-

sion on Rockwood's special appearance. The trial court first finds, in each instance, that Villagomez did not plead either theory and, indeed, Villagomez in its brief disavows any reliance upon those theories.

ent or doing business there, unless the foreign parent exerts such domination and control over its subsidiary that they are not in reality separate entities, and stating that "[t]he parent may have complete authority over general policy decisions at the subsidiary, including such matters as selection of product lines, hiring and firing of officers, and approval of sizable capital investments, without being considered to exercise domination of the company."). The trial court found no evidence or pleading to support any allegations of alter ego or single business enterprise, and Villagomez does not rely on those theories.

I would conclude that the evidence was legally and factually sufficient to support the trial court's findings that Rockwood could not be subjected to Texas jurisdiction based upon the status of Sumner's employment, Rockwood's approval of large capital expenditures, or on the maintenance of a place of business in Texas by virtue of Sumner's residence or business activities.

### 2. The Voluntary Undertaking to Provide Services to Benefit Texas Employees

Villagomez next alleges that Rockwood voluntarily undertook to perform services in Texas that it knew or should have known were necessary for the protection of residents of Texas, including the provision of allegedly mandatory safety policies, and the sending of Rockwood employees to Texas to conduct business, safety inspections, and safety training.[7] These activi-

ties are alleged to directly relate to safety and, therefore, to the incident involving Villagomez, triggering specific jurisdiction.

Villagomez tendered evidence that Rockwood provided the SHE Manual to Southern Clay, argues that the policies therein were mandatory for its subsidiary, and that Southern Clay complied with those policies. Villagomez tendered evidence alleged to support its contentions as follows: (a) Rockwood personnel monitored Southern Clay's compliance and safety performance; (b) Rockwood's risk manager, Piacentino, as well as other employees, traveled to Texas to provide safety services on a continuous basis; (c) Piacentino arranged for safety-related inspections, training, surveys, and audits; (d) Piacentino corresponded regularly with Southern Clay employees through e-mail about safety issues; (e) Piacentino traveled to Texas to perform process hazards audits in 2001, 2002, and 2003; and (f) Piacentino's name is included on a list with various Southern Clay personnel as a contact in the event of an emergency at the facility.

Rockwood countered with evidence that in some instances directly controverts the allegations of Villagomez. In other instances, Rockwood disagrees with the interpretation or meaning of the same evidence tendered by Villagomez, and cites evidence to support its interpretations.

Rockwood presented testimony to show that Rockwood's SHE Management Program Guidance Manual is indeed provided for guidance purposes only, that Southern

---

7. The Texas Supreme Court has recognized a theory of negligent undertaking as requiring the submission of the following specific duty predicates: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) a third party charged with protecting the plaintiffs relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiffs' risk of harm. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex.2000) (citing the Restatement (Second) of Torts § 323 (1965)); *see Coastal Corp. v. Torres*, 133 S.W.3d 776, 780 (Tex. App.-Corpus Christi 2004, pet. denied).

Clay had been in business for many years before its acquisition by Rockwood, and had developed, implemented, and continued to rely solely upon its own safety policies and procedures. Additional testimony reflected that Southern Clay policies and procedures already in place met or exceeded those provided in Rockwood's guidance manual, and that Southern Clay personnel did not rely upon and felt no need to modify existing policies to conform to any Rockwood suggestions.

It is undisputed that Piacentino traveled to Texas on occasion, but the purpose of most of those visits is directly disputed. Although it is undisputed that Piacentino communicated by e-mail with all subsidiaries about safety issues, the nature of that interaction is in dispute. Rockwood agrees that Piacentino is Rockwood's risk manager and responsible for securing package insurance for Rockwood and all its subsidiaries; however, the subsidiaries, including Southern Clay, pay for their own coverage. He is the key contact with the insurance companies. He also monitors the safety performance of Rockwood's subsidiaries. However, Rockwood also tendered evidence to show that it never undertook to direct or ensure safety for Southern Clay employees. Evidence showed (1) Southern Clay was responsible for its own training; (2) Southern Clay, rather than Rockwood or Piacentino, performed its own equipment inspections to determine when new equipment might be required and to ensure the safety of the equipment; (3) neither Rockwood nor Piacentino prepared, required, or conducted any safety training at Southern Clay; (4)

neither Rockwood nor Piacentino ever directed or conducted any safety audits at Southern Clay; (5) Southern Clay conducts its own self-audits; (6) Piacentino receives monthly reports on safety statistics from Southern Clay, as he does from all Rockwood subsidiaries; (7) Southern Clay and not Rockwood hired a third party to consult with respect to one audit, and no such third-party evaluators were hired by Rockwood; (8) on one visit to Southern Clay, Piacentino addressed in general terms only the protocol for conducting a safety audit;[8] (9) Piacentino does not direct Southern Clay's safety operations; (10) Southern Clay has its own safety management team; (11) Southern Clay's own personnel, including Stultz (operations manager) and Holmes (SHE manager), are responsible for identifying and implementing Southern Clay's safety policies and procedures; (12) Southern Clay's safety program is not submitted to Rockwood for approval; (13) MSHA investigated incidents at Southern Clay in 2001 and 2003, and all MSHA citations were issued to Southern Clay and not to Rockwood.

Villagomez also alleges jurisdiction attaches because Piacentino led the accident investigations following the 2001 and 2003 incidents at Southern Clay, and Piacentino authored the accident investigation reports provided to MSHA in each instance. Rockwood counters that while Piacentino was admittedly a member of the investigation teams for the 2001 and 2003 (Villagomez) incidents, he did not lead either investigation. Evidence was tendered to show that he was a primary contact with insurers and with MSHA.[9] Also, evidence

---

8. Deposition testimony was tendered to show that although written documents reflect that Piacentino conducted a process hazards audit in 2002, that event actually consisted of Piacentino providing instruction on hazards audit protocol.

9. A letter was forwarded announcing that Piacentino would lead the investigative team inquiring into Ismael Villagomez's death; handwritten notes of one team member also indicated Piacentino was leader of the team. Deposition testimony of several individuals was tendered to directly controvert this al-

confirms that Piacentino did author the reports to MSHA, with input from all team members.

"Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum." *Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex.2005) (per curiam). Any contacts of Piacentino with respect to an investigation of the 2001 incident are not related to the 2003 incident giving rise to Rockwood's potential liability. By the same token, Piacentino's participation in the 2003 investigation took place subsequent to the incident, and are therefore also not related to Rockwood's potential liability. The trial court could property conclude these contacts were insufficient to give rise to specific jurisdiction.

The trial court also considered the fact that MSHA citations were issued only to Southern Clay and not to Rockwood, but that MSHA has authority to issue citations to a parent where it has taken over the safety programs of the subsidiary. The trial court could reasonably infer that MSHA did not conclude that Rockwood had taken over safety responsibilities for Southern Clay.

With respect to the remaining potential bases for specific jurisdiction as set out above, conflicting evidence existed and the parties applied conflicting interpretations. Rockwood contends that Piacentino's communications with Southern Clay regarding safety were consistent with his communications with all Rockwood subsidiaries that were engaged in varying sorts of busi-

nesses, and constituted only the normal, routine interactions one would find between a parent and its subsidiary.[10] The trial court agreed, issuing a finding to that effect, as well as other multiple findings consistent with Rockwood's evidence and interpretations.

I remain mindful that the trier-of-fact remains the sole judge of the credibility of the witnesses and the weight to give their testimony. *Keller*, 168 S.W.3d at 819. It may choose to believe one witness and disbelieve another, and a reviewing court cannot impose its own opinions to the contrary. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. I am further mindful that an appellate court is not to assess liability or any issue on the merits, but rather the nature and extent of any purposeful contact by Rockwood with Texas for jurisdictional purposes only. "[S]pecific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum." *CSR*, 925 S.W.2d at 595. Specific jurisdiction requires a "substantial connection" between the plaintiff's cause of action and the defendant's contacts, such that those contacts, both with the litigation and the forum, are meaningful, not "random, fortuitous, or attenuated." *Ahadi*, 61 S.W.3d at 719.

The trial court was required to weigh and balance the evidence before it. I would conclude the evidence is legally and factually sufficient to sustain the trial

leged leadership role. The internal investigation report lists nine members of the investigative team, with Piacentino listed last.

**10.** Rockwood cited *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 119–20 (Tex.App.-Houston [1st Dist.][2000, pet dism'd w.o.j.]) to urge that its contacts with Southern

Clay were simply routine actions between a parent and its subsidiary, of the type that will not trigger personal jurisdiction over the parent. Because *Preussag* applies general jurisdiction rather than specific jurisdiction, I discuss this argument in depth when I address the question of general jurisdiction.

court's findings that the interactions of Rockwood with Southern Clay on safety issues were not such that they would trigger specific jurisdiction.

## C. General Jurisdiction and "Continuous and Systematic" Contacts

Villagomez urges that the various communications between Rockwood (a) through Sumner, in his capacity as head of Rockwood's additives business in the United Kingdom, and (b) Piacentino with Southern Clay, even if not sufficient to establish specific jurisdiction, did reflect a systematic and continuous interaction sufficient to trigger general jurisdiction. Villagomez also urges that Rockwood conducted other business in Texas in a "continuous and systematic" manner sufficient to trigger general jurisdiction.

Villagomez urges general jurisdiction can attach based upon Sumner's work in his role as a dual employee, performed in Austin, for the benefit of Rockwood's clay additives business in the United Kingdom between 2001 and 2005. Villagomez contends this amounts to maintaining a business office in Texas for the benefit of Rockwood. Controverting evidence was tendered by Rockwood to show that the United Kingdom business is not a subsidiary of Rockwood, which is a holding company for only United States based subsidiaries. An entirely separate, albeit related, company is the holding company for all overseas corporations. To further confuse matters, Sumner would report to Rockwood's president in that instance as well, but that individual apparently also served in a dual role and held office with respect to the separate company owning the overseas interests. Therefore, I would conclude that any in-formation related to the business located in the United Kingdom, whether or not Sumner actively participated in that business, is irrelevant to the assertion of jurisdiction over Rockwood.

Villagomez also asserts general jurisdiction is proper based upon Rockwood's records management policy, which reflects that all records are owned by the relevant subsidiary and Rockwood. Similarly, Rockwood is a third party beneficiary of Ismael Gomez's employment contract with Southern Clay with respect to intellectual property. However, Rockwood's ownership of records or intellectual property is derivative only, behind Southern Clay's ownership, and derives principally from Rockwood's 100% ownership of Southern Clay. "Stock ownership and the related right of control that stock ownership gives to stockholders [even a sole stockholder] are insufficient to destroy the distinctness of corporate entities for jurisdictional purposes." *Commonwealth*, 177 S.W.3d at 925.

Villagomez also points to travel of various other Rockwood employees to Texas for business. These visits include the following: (1) Rockwood's president (two visits in 2002 and one in 2003 for business review, and a visit to attend a "global sales meeting" in Austin in 2002 [11]); (2) Rockwood's former president (four visits in 2001, purposes for two unknown, the third visit to meet with Sumner, and the fourth to attend a bond and rating agency meeting); (3) Rockwood's Controller (once in 2002 for business review); (4) Rockwood's Vice President for Law and Administration (three times in 2002 for business review); (5) Rockwood's senior legal counsel (one visit in 2003 subsequent to Villagomez inci-

---

11. Rockwood tendered testimony to show this "global sales meeting" in fact related solely to Southern Clay's business and its sales repre-sentatives, and that Rockwood has no sales force.

dent); and (6) Rockwood's CFO (three site visits, two in 2001 and one in 2002, visits for business review once in 2002 and once in 2003).

The remaining travel of Rockwood personnel involved visits by Piacentino. He made visits between 2001 and 2003 that included (1) May 2001 (MSHA visit), (2) May 2002 (site visit), (3) February 2003 (two separate visits related to the Villagomez incident), and (4) April 2003 (two additional visits related to the Villagomez incident). Piacentino also communicated with Rockwood personnel relating to safety statistics, and with respect to the 2001 and 2003 incidents and, as previously noted, he participated as a member of Southern Clay's 2001 and 2003 investigation teams. Villagomez alleges that Piacentino's contacts alone are sufficient to trigger general jurisdiction over Rockwood.

Rockwood urges that the trial court properly concluded that the various visits and interactions were sporadic and conformed to normal, routine interactions between a parent and subsidiary corporation, relying heavily upon *Preussag Aktiengesellschaft v. Coleman,* 16 S.W.3d 110, 119–20 (Tex.App.-Houston [1st Dist.][2000, pet dism'd w.o.j.). Preussag, a German holding corporation, had relations with its indirect Texas subsidiaries which were its sole contacts with Texas. The bases alleged for jurisdiction over Preussag were the subsidiaries' provision of financial reports, their reference to Preussag's "Greenbook" delineating standard German accounting procedures, the provision of lines of credit to subsidiaries and some "banking" services to facilitate intercompany dividend payments, and loan repayments or payments for services and products sold between group companies. Preussag also purchased excess liability insurance to cover those subsidiaries in which it held at least fifty percent

interest. Additionally, some administrative assistance was provided. In each instance, Preussag was a remote parent, holding interest in the specific company through subsidiaries, sometimes in several layers. There were additional communications between the subsidiaries and Preussag in sporadic letters. There were two meetings between company representatives. The court determined that all of the interactions were normal, corporate actions "such as occasional audits; unified financial procedures for the annual reporting ...; a unified 'banking' system, ... parent approval of large expenditures and budgets; consideration of adopting a group benefits system; and the communications and visits that accompany these activities." *Id.* at 118–19. The court concluded that Preussag's "routine activities" within its system did not make it amenable to suit in Texas because it failed to show any "purposeful contact with Texas." *Id.* at 123. The contacts were of the type provided to any member of its corporate family in any location. *Id.* In addition, the direct communications between Preussag and its Texas subsidiaries were "fortuitous" only, since the "banking system" in issue was not directed toward Texas, and the subsidiaries were not its alter ego. *Id.* at 124. "Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact." *Id.* at 124 (citing *Garner v. Furmanite Austl. Pty.,* 966 S.W.2d 798, 803 (Tex.App.–1st Dist.] Houston 1998, pet. denied) (holding no general jurisdiction over individual who made eight to ten visits over sixty days to Texas); *see also Helicopteros Nacionales,* 466 U.S. at 418, 104 S.Ct. 1868 (finding no general jurisdiction despite defendant corporation's sending management and personnel to Texas for consultation and training over seven-year period)); *Coleman,* 83 S.W.3d at 808 (citing *Dalton v.*

*R & W Marine, Inc.*, 897 F.2d 1359, 1362 n. 3 (5th Cir.1990) ("purchases and trips related thereto, even if they occur regularly, are not, standing alone, a sufficient basis for the assertion of jurisdiction.")).

I conclude the trial court could properly find that the travel of the various corporate executives of Rockwood to visit Southern Clay was, for the most part, normal and routine and therefore insufficient to trigger general jurisdiction. Piacentino's contacts were also carefully reviewed by the trial court. His contacts were not systematic and continuous, but rather were sporadic. *See BMC*, 83 S.W.3d at 797 (requiring that the defendant conduct substantial activities within the forum, "a more demanding minimum contacts analysis than for specific jurisdiction."); *see also Helicopteros Nacionales*, 466 U.S. at 418, 104 S.Ct. 1868. The communications by e-mail related to the gathering of safety statistics, and not to providing direction or control to Southern Clay on how to conduct its safety management. Evidence supported that the bulk of Piacentino's visits were routine and part of the normal interaction between a parent and subsidiary. Further, they were comparable to and of the type provided to any member of Rockwood's corporate family. *See Preussag*, 16 S.W.3d at 123. Evidence also reflected that his conduct in connection with and subsequent to the 2001 and 2003 (Villagomez) incidents, and his participation in the MSHA investigations and reports, was that as a parent interested in significant events occurring at its subsidiary, in which a parent would have a natural interest as sole stockholder. *Id.* Evidence existed to support Rockwood's contention that Piacentino neither directed not controlled the investigations, but simply participated and acted as a liaison in communicating results of those investigations. I would conclude the evidence is not too weak to support the trial court's findings as to general jurisdic-

tion with respect to Piacentino's interactions, and the findings are not so against the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *Golden Eagle*, 116 S.W.3d at 761.

To complete analysis, it is necessary to look to Rockwood's other business contracts with three other Texas entities. First, there is an alleged December 2001 contract with Royal & Sun Alliance, of Addison, Texas. Villagomez alleges Rockwood requested a boiler inspection be performed for Southern Clay in conjunction with securing insurance. The documents in evidence include letters from Royal & Sun Alliance to Southern Clay about the inspection, with a copy to Piacentino. They do not include a copy of a contract. Nothing indicates that the agreement is with Rockwood.

Next in issue is an alleged 2002 contract between Rockwood and Hartford Steam Boiler Inspection and Insurance Company, working out of its Houston office, to perform an inspection at Southern Clay. The document in evidence reflects only that internal inspections were conducted on three tube boilers located at Southern Clay by Hartford on behalf of its insured, Rockwood. Letterhead identifies the Hartford Steam Boiler Inspection and Insurance Co. at its Atlanta, Georgia address. Copies of the report were issued to Piacentino, Hartford Steam Boiler, and "Southern Clay Products, Subsidiary."

Finally, there is a contract between Rockwood and HealthFirst Administrative, entered into January 1, 2003, and effective through 2005. Under this agreement, HealthFirst serves as independent third party administrator for benefits for the entire family of Rockwood companies. HealthFirst is admittedly a Texas corporation. The contract with Rockwood states it "shall be interpreted and construed in

accordance with the law of the state of Texas except to the extent superseded by federal law." Donna Abrunzo testified that this agreement was negotiated by a third party consultant and signed by Rockwood in New Jersey.

In some circumstances, a single contract may meet the purposeful-availment standard, but not when it involves a single contact taking place outside the forum state. *See Michiana*, 168 S.W.3d at 787. A long-term franchise agreement may establish minimum contacts because, though it stems from a single contract, it involves many contacts over a long period of time. *Id.* (citing *CMMC v. Salinas*, 929 S.W.2d 435, 438 (Tex.1996)). Similarly, a life-insurance policy may stem from a single contract, but necessarily involves a series of contacts until death does the parties part. *Michiana*, 168 S.W.3d at 787 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

Jurisdiction is premised on the notion of consent. *Coleman*, 83 S.W.3d at 808. "[B]y invoking the benefits and protections of a forum's laws, a nonresident defendant consents to being sued there." *Id.* Rockwood urges there was no consent because the contract with HealthFirst does not obligate Rockwood to perform any services in Texas. Villagomez counters that executing a contract subject to Texas law constitutes consent to be subject to Texas jurisdiction. However, case law provides otherwise.

I have reviewed *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201 (Tex.App.-Houston [14th Dist.] 2003, pet. denied), in which the court discussed a contract between an Italian company and a Texas corporation which contained a Texas choice-of-law provision. Reid had asserted that by agreeing to this Texas choice-of-law provision, Alenia availed itself of the benefits and protections of Texas law and consented to

being sued in Texas. The Houston court disagreed, determining that agreeing to a Texas choice-of-law provision, without more, did not mean a party availed itself of any protection from Texas courts or voluntarily submitted to personal jurisdiction in Texas courts, absent an express understanding to that effect. *Id.* at 219; *see also 3–D Elec. Co. v. Barnett Constr. Co.*, 706 S.W.2d 135, 145 (Tex. App.–Dallas 1986, writ ref'd n.r.e.) ("although a 'choice of law' provision in a contract is significant in determining whether jurisdiction should be had in the forum state, such a provision cannot be construed as a voluntary submission by a defendant to the personal jurisdiction of the courts of the state in the absence of any express understanding to that effect.") (citations omitted). There was no evidence in the *Reid* record of an express understanding that Alenia submitted to the jurisdiction of Texas courts by executing the contract. Here, there is similarly no evidence of any express understanding that Rockwood agreed to submit to personal jurisdiction in Texas. I cannot conclude that Rockwood is subject to general jurisdiction of the Texas courts based on this contract with HealthFirst, or on the other contracts in issue.

### D. Traditional Notions of Fair Play and Substantial Justice

A party opposing a nonresident defendant's special appearance must show that the exercise of in personam jurisdiction comports with fair play and substantial justice. *Schlobohm*, 784 S.W.2d at 357–58 (citing *Asahi*, 480 U.S. at 113, 107 S.Ct. 1026; *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174); *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154. However, because I find that neither specific nor general jurisdiction attaches, I do not perform this analysis.

## VII. Conclusion

In considering this special appearance, I have not reached the merits of the allegations or determine whether a wrong has been committed in Texas. Rather, I have looked solely to determine whether Rockwood initiated contacts with Texas by which it purposefully availed itself of the privilege of conducting activities in Texas, thereby invoking the benefits and protections of Texas laws such that it could reasonably anticipate being called into a Texas court.

The evidence before the trial court supported its conclusions that neither specific nor general jurisdiction attach to Rockwood. The trial court's conclusions of law are not erroneous as a matter of law. *Stable Energy*, 999 S.W.2d at 547; *Hofland*, 907 S.W.2d at 599. Accordingly, I would overrule Villagomez's issues on appeal and affirm the trial court's order granting Rockwood's special appearance.