

# NUMBER 13-07-149-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**ENGLISH MARINE AGENCY, INC.,**                    **Appellant,**

**v.**

**BORDER SHIPYARDS, INC., ET AL.,**                    **Appellees.**

---

## On appeal from the 103rd District Court of Cameron County, Texas.

---

# MEMORANDUM OPINION[1]

### Before Justices Yañez, Rodriguez, and Benavides
### Memorandum Opinion by Justice Benavides

Appellant, English Marine Agency, Inc. ("English Marine"), appeals a judgment rendered on a jury verdict in favor of appellees, Border Shipyards, Inc. ("Border") and its shareholders, Jorge Gonzalez, Carl Gayman, and Ruben Barrera. By several issues,

---

[1] The case's procedural background is complex, but the issues raised in this appeal are neither complex nor novel. As this is a memorandum opinion and the parties are familiar with the facts, we will not recite the facts here except as necessary to advise the parties of the Court's decision and the basic reasons for it. TEX. R. APP. P. 47.4.

English Marine argues that (1) the evidence is legally and factually insufficient to support the jury's verdict, (2) the appellees were precluded by res judicata and collateral estoppel from relitigating whether English Marine engaged in "unconscionable conduct," and (3) the trial court failed to give proper credit for a settling defendant. We affirm.

## I. Background

### A. Underlying Accident and Prior Litigation

Border is a shipyard that repairs shrimp boats. It is located at the Port of Brownsville. In 1985, Border was purchased by Jorge Gonzalez, Carl Gayman, and Ruben Barrera (collectively "the shareholders").[2] Border purchased insurance coverage through its agent, Eleanor "Perk" English, who operated through different business entities over the years. In 1998, Border purchased an insurance policy from St. Paul Mercury Insurance Company through Perk, who was then operating as English Marine Agency. The policy, which became effective on April 28, 1998, provided in section II, paragraph 1 that St. Paul

> will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
> > COVERAGE A       Bodily Injury
> > COVERAGE B       Property Damage
> to which this insurance applies, caused by the occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages even if any of the allegations of the suit are groundless, false or fraudulent . . . .

The policy defined bodily injury to include death. However, exclusion "J" of the policy excluded coverage for

> bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to

---

[2] Billy Keenan and Buster Harris were also shareholders at the time Border Shipyards, Inc. was purchased. They are not parties to this appeal.

2

indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured out of an incidental contract[.]

In other words, St. Paul agreed to cover Border's duty to indemnify another party because of a personal injury or death if the liability was assumed under an incidental contract. The policy initially defines "incidental contracts" to apply to leases, certain easement agreements, indemnities required by municipal ordinances, sidetrack agreements, and elevator maintenance agreements. However, in section III, the policy expands the definition of "incidental contracts" to include "any oral or written contract or agreement relating to the conduct of the Named Insured's business." Additionally, the policy provided that Border could name additional insureds under the policy if it did so in writing.

Ricardo Rivera owned a boat called La Negrita, and in 1998, he brought it to Border for repairs. According to an invoice for work it performed, Border charged a fee labeled "marine insurance." Gonzalez testified that this practice was adopted from Border's prior owners, and it is a common practice for shipyards. He testified that Border charged 4.5 percent of the cost of repairs to cover the cost of marine insurance for the boats. Gonzalez testified that he had oral agreements with the owners of the boats repaired at Border that required him to provide insurance coverage for the boats. He clarified that "it was understood that we were responsible for the boats while they were out of the water." Michael Swetnam, Border's insurance expert, also testified that it was customary for shipyards to assume liability to indemnify the boat owners "if anything happens to the boat or to anybody on the boat when that person's boat is in their care, custody or control. That's all done on a handshake . . . ."

On May 11, 1998, Ernesto Lopez, a Border employee, was welding in the freezer

3

room of La Negrita and was electrocuted. Border had an employee injury trust fund, which paid for Lopez's funeral and paid his widow a few weeks' salary. However, Border did not carry worker's compensation coverage. Lopez's family filed the underlying wrongful death suit in Cameron County district court against Border, Border's shareholders, and Rivera.[3] They alleged that Border's and Rivera's negligence resulted in Lopez's electrocution and death. The Lopez family further alleged that Border was undercapitalized and was designed and structured as a means of perpetrating fraud and avoiding its legal obligations. As a result, the Lopez family argued that the Border shareholders were liable for their damages.

Rivera filed a cross-claim against Border, but not against Border's shareholders. Rivera alleged that he entered into a contract with Border that provided or implied that "any claim for injury or death of employees, workers, agents, invitees, and/or sub-contractors of [Border] performing work on board the [La] Negrita would be insured, defended and paid for by [Border], and that [Rivera] would be held harmless and indemnified by [Border] from any liability . . . ."

Border and its shareholders sought insurance coverage from St. Paul for the damages claimed by the Lopez family. Rivera also demanded coverage directly from St. Paul. Rivera claimed that he had an oral agreement whereby Border agreed to indemnify him. Additionally, Rivera claimed that Border charged him for insurance by including a charge for marine insurance on his billing invoices, which he claimed was written evidence of a contract or agreement to indemnify him. St. Paul denied both requests for coverage.

---

[3] The original lawsuit was dismissed without prejudice. The Lopez family refiled the underlying suit on February 16, 2000.

Border and Rivera filed suit against St. Paul in Cameron County district court, and St. Paul removed the case to federal court on February 2, 1999.

St. Paul moved for summary judgment in the federal coverage suit, arguing that the policy did not provide coverage. The federal district court interpreted the insurance contract. It held that exclusion J precluded coverage for Border's and its shareholders' potential liability for Lopez's death because Lopez was an employee. Additionally, the court held that the "incidental contracts" exception to exclusion J was "not designed for the sweeping type of oral indemnification agreement alleged by Border and Rivera." Additionally, the court held that such an indemnification agreement would not be valid under federal maritime law because it would not meet the "clear and unequivocal" standard. *See Randall v. Chevron USA, Inc.*, 13 F.3d 888, 905 (5th Cir. 1994). Finally, the court held that Rivera did not qualify as an additional insured under the policy because he was not designated as such by a written agreement. The court noted, however, that "if Rivera believes he contracted for 'additional insured' status with Border, his remedy is a breach of contract action against Border for breach of its contract to procure insurance." For all these reasons, on February 12, 2002, the federal district court granted St. Paul's motion for summary judgment.

On February 23, 2001, while the coverage suit was pending and before the federal district court rendered summary judgment, Border and its shareholders filed a third-party petition against English Marine in the wrongful death action. Border and its shareholders alleged various causes of action, including breach of contract, breach of fiduciary duty, and

5

violations of the Texas Deceptive Trade Practices Act.[4]  On December 15, 2004, Border, Border's shareholders, and Rivera settled the Lopez family's claims against them for $500,000.  Border's shareholders, Gonzalez, Barrera, and Gayman, each paid one-third of the settlement amount, or $133,333.34.  Rivera did not pay any money to settle the suit.  Instead, Border's shareholders paid on his behalf.  Gonzalez testified that the settlement money was paid to settle "[t]he lawsuit against Border Shipyards and La Negrita, and ours too, I guess."  In exchange, the Lopez plaintiffs dismissed their claims against Border, its shareholders, and Rivera with prejudice.  Rivera then settled with Border.  In exchange for the payment of the settlement to the Lopez plaintiffs and for payment of $18,749.28 for Rivera's attorney's fees, Rivera entered an agreed judgment dismissing his cross-claim against Border.

## B.    Trial on the Third-Party Claim Against English Marine

The only action left pending in the Cameron County district court was the action against English Marine by Border and its shareholders.  The jury was asked to decide whether English Marine breached a contract to provide insurance that would cover Border's liability for a boat owner's negligence, whether English Marine breached a fiduciary duty, and whether English Marine engaged in unconscionable conduct.  The following facts relating to these claims were adduced at trial.

Perk began working in insurance in 1964 and became an insurance agent in 1974.  In 1980, she formed English Insurance Agency, which she operated from 1980 until 1995.  Perk sold marine insurance, which is a specialized type of insurance.  According to Perk,

---

[4] The trial court granted summary judgment and directed verdicts on several of Border's causes of action, and those orders have not been appealed to this Court.

there are few agents in the Brownsville area that specialize in marine insurance. Perk focused on shrimp boat insurance.

Shortly after purchasing Border in 1985, the shareholders sought insurance for the business, and they contacted Perk. Gonzalez was Border's president at the time, and he testified that he had the responsibility for getting insurance for the shipyard. According to Gonzalez, he was unfamiliar with insurance. He testified that Perk was well known in the local shrimp business because she sold 80 percent of the policies to the local boat owners. He contacted her because of her expertise.

Gonzalez testified that when he first contacted Perk, she told him that "she knew what we needed." He stated that she never asked what kind of insurance the shipyard wanted because "he wouldn't know what was needed." Gonzalez testified that he relied on Perk to get him insurance sufficient to cover the shipyard's needs. He testified that Perk had access to Border's financial records and was familiar with the shipyard's business because, at some time after the relationship with Border began, Perk rented office space from Border at the shipyard.

Perk disputed this testimony. She claimed that when she was contacted by Border in 1985, Border asked for coverage for the boats Border repaired while they were in their custody and control. Perk claimed that Border asked for coverage for the boats themselves, and nothing more. Thus, she sold Border a "protection and indemnity" policy.

The policies that Perk sold to Border were for one-year terms. Thus, the policies Perk sold were renewable every year. Gonzalez testified that when the policy came up for renewal, Perk would notify him that the policy was about to expire. She would ask Gonzalez if he wanted to renew the policy, and he would instruct her to do so. Gonzalez

7

stated that he could not recall a single time when Perk sat down with him and explained the coverages in the policy.

Perk testified that she knew that Border needed premises liability coverage, but Border did not ask for that initially. In 1988, she obtained premises liability coverage and worker's compensation coverage for Border. Later, Border's shareholders decided that the worker's compensation coverage was too expensive and declined further coverage. Instead, Border created an "injury trust fund" for its employees to pay for any work-related injuries.

In 1995, Perk sold English Insurance Agency to three other agents. However, she continued to work for English Insurance Agency for three years. Perk testified that during that three years, she only worked on the shrimp boat insurance. She stated that "[i]t was a specialized business[,] and they wanted nothing to do with it."

At the end of 1997, Perk purchased the marine "book of business" from English Insurance Agency. Perk testified that a "book of business" is a collection of policies that are already in place, which allows the owner of the book of business to earn commissions by renewing the existing policies. Perk then formed English Marine Agency, Inc., which began operating on January 1, 1998.

On January 21, 1998, Border designated English Marine, Perk's new agency, as its agent of record. On January 28, 1998, English Marine submitted an application to Century Surplus Lines[5] on Border's behalf to renew the current policy. According to Gonzalez, he did not fill out the application for insurance. Rather, Perk brought him the application with

---

[5] Century Surplus Lines was an intermediary between English Marine and St. Paul Mercury Insurance Company, which issued the policy for the 1997 term.

the information already filled in the blanks, and Gonzalez signed it. In the application, there is a space provided for the applicant to answer whether it has any "[g]uarantees, warranties, [or] hold harmless agreements." This space was left blank. Border's insurance expert, Swetnam, testified that looking at the application and considering that no answer was filled in, it appeared that the agent "didn't ask the question if they had any hold harmless or indemnity agreements." He testified that the application English Marine filled out on Border's behalf was incomplete.

According to English Marine, Gonzalez did not timely authorize Perk to renew the existing policy. Thus, on May 1, 1998, Century Surplus Lines notified Perk that because the policy had not been renewed, St. Paul Mercury Insurance Company "has ceased to provide coverage as of 12:01 a.m. C.D.T. April 28, 1998." Gonzalez then authorized English Marine to renew its coverage. Thus, on May 4, 1998, English Marine notified Century Surplus Lines that Gonzalez had authorized renewal of the policy as quoted by English Marine. English Marine requested that Century Surplus Lines fax a binder of insurance as soon as possible. According to Perk, a "binder" sets forth the coverages that English Marine quoted.

On May 7, 1998, Century Surplus Lines sent Perk the binder of insurance along with a cover letter. The cover letter states that coverage was bound with St. Paul "as requested," and it notes that coverage was requested to back date to April 28 when the prior policy lapsed. Accordingly, Century Lines requested a "no known/reported loss letter signed by the assured." The letter also informed Perk of amendments to the policy:

> The current St. Paul wording has been amended with regard [to] Section III, Clause XII. This relates to Blanket Waiver/Additional Assured wording. The new wording reads as follows:

9

XII. Blanket Waiver/Additional Assureds Endorsement

It is agreed that the Underwriters waive their rights of subrogation against any person or company to whom the Named Assured is obligated by written contract to provide such waiver with respect to third party vessels while being repaired/constructed by the Named Assured.

It is further agreed that to the extent the Named Assured is obligated by written contract to name any person(s) or company as additional assured hereunder, the underwriters agree that such person(s) or company shall be considered as additional assureds but with respect to and while said third party additional assureds vessels are being repaired or constructed.

We don't believe this would effect this account but please advise if there are any questions/comments.

Border gave English Marine a statement of no known claims, which was forwarded to Century Surplus Lines on May 7. On the fax cover sheet, English Marine's employee, Shelton Coleman, writes: "Following is the letter of no losses. New wording doesn't seem to be a problem." Gonzalez testified that the new wording was not explained to him. Swetnam further testified that, because it was standard in the shipyard industry to create verbal agreements to indemnify boat owners, English Marine breached the standard of care applicable to an insurance agent by failing to disclose to Border that those types of agreements would not be covered by the policy. Specifically, Swetnam stated:

What type of operation that these gentlemen had and the type that's typical to the Port where they are doing people's boats, pulling people's boats out of the water and they are doing handshake deals, indemnity agreements only handshakes, I think that you would have an obligation to tell the insured that verbal indemnity agreements probably aren't enforceable and that you need to do it in writing, and if you don't do it in writing, you don't have coverage. I think you need to disclose that.

Perk disputed this testimony and claimed she explained the new wording.

10

With respect to whether there was an agreement to indemnify Rivera, Gonzalez testified that it was Border's practice to form oral agreements with boat owners, and it was "understood" that the boats were covered while they were out of the water. On cross-examination, the following exchange occurred:

| | |
|---|---|
| Defense counsel: | Do you remember being asked that question—do you remember being asked the question, "Mr. Gonzalez, do you understand that one of the Border Shipyards' allegations in this particular case is that Border Shipyards had an agreement with the owners of the La Negrita to assume their liability, La Negrita's liability for injuries that occurred on that vessel?" Do you remember being asked that question? |
| Gonzalez: | I don't remember, but I'm reading it right now. |
| Defense counsel: | And what was your answer? |
| Gonzalez: | I don't remember. |
| Defense counsel: | What was your answer on line 7? |
| Gonzalez: | "I don't think there was any agreements." |
| Defense counsel: | You said that, didn't you? |
| Gonzalez: | Yeah, if it's there, I said it. |
| Border's counsel: | Judge, for the Rule of Optional Completeness, I would ask the Court that he be allowed to— |
| Defense counsel: | I would be happy to read the next few pages, Judge. |
| Border's counsel: | Judge, the next two lines, which would be line 8 through line 10. |
| . . . . | |
| Gonzalez: | Line 8 is "Okay. So that's not your understanding." Line 9 is, "No, we all—it was a |

11

common practice among boat owners."

| | |
|---|---|
| Border's counsel: | He can continue to line 14. |
| Gonzalez: | 11, question, "That's what—what was a common practice? 12, the answer, "I had mentioned before that to haul the boat out is covered by the insurance policy as long as it is out of the water. |
| Defense counsel: | So it was Border Shipyard's practice to indemnify the boat owners when the boat was out of the water? |
| Gonzalez: | Yes. |
| Defense counsel: | Okay. But it wasn't an oral or written agreement that you had with the boat owner? |
| Gonzalez: | Right. |
| Defense counsel: | So what you're telling the jury is that even though there was no agreement, Border Shipyards chose the practice of doing that, of indemnifying the boat owner? |
| Gonzalez: | The—remember that Mr. Abrego was in charge of the railway. He was the one that talked to the boat owners and I cannot say what he discussed with them. |
| Defense counsel: | But that's your understanding— |
| Gonzalez: | They didn't come to me and had an agreement, oral or written, with me. |
| Defense counsel: | Or with Border Shipyards? |
| Gonzalez: | With the company either, because there is no—I can't prove there was a written agreement. But they could have had the agreement with Frank Abrego. |

Frank Abrego did not mention in his testimony that he had an agreement with Rivera.

However, he did state that the marine insurance charge was "in case something happened

to the ships." Swetnam also testified that, because it was standard in the shipyard industry to create verbal agreements to indemnify boat owners, English Marine breached the standard of care applicable to an insurance agent by failing to disclose to Border that those types of agreements would not be covered by the policy.

Perk agreed that she could have obtained an insurance policy that would indemnify boat owners for their own negligence. Gary Beck, English Marine's insurance expert, testified that he could think of several policies that could have been sold that would have indemnified the boat owners.

After both sides presented evidence, the jury was asked, "Did Border Shipyards and English Marine agree that English Marine would obtain an insurance policy that would protect ship owners from their own negligence while the boat was in the care of Border Shipyards?" The jury answered, "Yes." The jury then found that English Marine failed to comply with its agreement. Next, the jury found that a relationship of trust and confidence existed between Border Shipyards and English Marine and that English Marine failed to comply with its fiduciary duties. The jury then found that English Marine engaged in an unconscionable course of action that was a producing cause of damages to Border Shipyards. The jury awarded Border Shipyards $4,500 for its payment of ad litem fees in the wrongful death suit, awarded $18,504.65 to Border Shipyards for its payment of Rivera's attorney's fees, and awarded each of the shareholders $133,333.34. In addition, it awarded $115,000 in attorneys fees for trial and $55,000 in the event of an appeal. Finally, the jury found that neither Border Shipyards nor its shareholders, agents, employees, representatives, or servants were negligent. The trial court rendered judgment on the verdict, and this appeal ensued.

13

## II. Legal and Factual Sufficiency

By its first, second, third, fifth, and seventh issues, English Marine argues that the evidence is legally and factually insufficient to support the jury's verdict.

### A.    Standards of Review

By its first, second, third, and fifth issues, English Marine challenges the legal and factual sufficiency of the evidence supporting the jury's findings of breach of contract, breach of fiduciary duty, and damages.   These are issues on which Border and its shareholders bore the burden of proof.  *See Sears, Roebuck & Co. v. AIG Annuity Ins. Co.,* No. 05-07-00758-CV, 2008 WL 3867513, at *3 (Tex. App.–Dallas Aug. 21, 2008, no pet. h.) (holding plaintiff has burden in breach of contract action to establish breach); *Edwards v. Pena,* 38 S.W.3d 191, 198 (Tex. App.–Corpus Christi 2001, no pet.) (holding plaintiff alleging breach of fiduciary duty bears burden of proof); *Dalton v. George B. Hatley Co., Inc.,* 634 S.W.2d 374, 376 (Tex. App.–Austin 1982, no writ) (holding plaintiff suing on contract has burden to establish existence of contract).

Under these circumstances, we view the evidence in the light most favorable to the verdict to determine whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."  *Id.*  We will sustain a challenge to the legal sufficiency of evidence only if:  (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only

evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists, and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

By its seventh issue, English Marine challenges the factual sufficiency of the evidence supporting the jury's finding that Border and its shareholders were not negligent. English Marine bore the burden of proof on this issue. *Ins. Network of Tex. v. Kloesel*, No. 13-05-680-CV, 2008 WL 907479, at *9 (Tex. App.–Corpus Christi Apr. 3, 2008, pet. filed). In conducting a factual sufficiency review, we do not substitute our judgment for that of the jury; rather, we view all the evidence in a neutral light to determine whether the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 749 (Tex. App.–Corpus Christi 2006, pet. denied).

15

English Marine attacks every cause of action reviewed by the jury. When a plaintiff receives favorable findings on two or more theories of recovery, the plaintiff is entitled to judgment on the theory which affords the greatest recovery. *Boyce Ironworks, Inc. v. Sw. Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988). In this case, the trial court awarded actual damages and attorney's fees, thus indicating that Border and its shareholders recovered under either their breach of contract or unconscionable conduct theories. We will first address English Marine's issues challenging recovery under the breach of contract theory. *See Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.–Fort Worth 2006, pet. denied) (reviewing DTPA findings first because they afforded greatest recovery).

## B. Breach of Contract

"The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from that breach." *Adams v. H & H Meat Prods., Inc.,* 41 S.W.3d 762, 771 (Tex. App.–Corpus Christi 2001, no pet.). English Marine attacks the first and third elements—the existence of a valid contract and breach of the alleged contract.

### 1. Existence of a Contract

The jury was asked, "Did Border Shipyards and English Marine agree that English Marine would obtain an insurance policy that would protect shipowners from their own negligence while the boat was in [the] care of Border Shipyards?" It answered, "Yes."

16

English Marine argues that the jury's answer to this question was not supported by legally or factually sufficient evidence.

English Marine first argues that it did not formally exist until December 31, 1997. Therefore, if there was any contract with English Marine to obtain insurance coverage covering boat owners for their own negligence, it had to be entered into in 1998. English Marine then argues that the only contract that could possibly be gleaned from the record is the agreement to authorize English Marine to renew the policy that was in place for the year 1997.

English Marine argues that Border allowed its 1997 policy to expire. Thus, "as a matter of law," any previous offer or request to obtain a particular type of insurance lapsed with the previous policy, and any new policy would necessarily be subject to new conditions. Notably, English Marine does not cite any law that requires this conclusion. Nevertheless, English Marine argues that when the new 1998 policy was forwarded to Border, Border was informed of the changes to the policy—specifically, English Marine argues that Border was notified that the new policy required additional insureds, such as boat owners, be added in writing. English Marine further argues that the evidence shows that Border did not have any agreement to indemnify Rivera; thus, neither the old policy nor the new policy would have covered Rivera's negligence because Border failed to adequately invoke the terms of the policies. In summary, English Marine argues that the only contract that existed was that English Marine agreed to renew existing policy coverage with the new condition that additional insureds must be added in writing, and English Marine complied with the contract.

17

Additionally, English Marine argues that because there existed an explicit contract to renew the 1997 policy with the additional condition, there can be no implied contract between the parties to obtain a different type of policy. Nor can conduct or course of dealing establish a different agreement.

In response, Border argues that English Marine takes "an exceptionally narrow" reading of the facts regarding the contract at issue. Border argues that English Marine is inverting the standard of review of a jury verdict by selectively discussing the evidence in the record instead of viewing the evidence in the light most favorable to the jury verdict. *See City of Keller*, 168 S.W.3d at 827.

Border argues that when it first contacted Perk in order to purchase insurance in 1985, she offered to provide Border with her expertise in selecting maritime insurance, offered to obtain insurance sufficient to cover Border's needs, and represented that she "knew what they needed." Border argues that it accepted this offer, year after year, by purchasing insurance through Perk. Border argues that Perk was well aware of its needs because she had access to Border and its financial records. Because English Marine did not obtain sufficient coverage for Border, Border argues that English Marine breached its contract.

In response to English Marine's argument that it did not exist until 1997, and therefore no contract could have been formed before that time, Border points out that English Marine purchased the marine "book of business" from English Insurance Agency, which included Border's policy. Border further points out that English Marine never argued that it purchased only these assets or policies, and not the concomitant liabilities, from English Insurance Agency.

18

We agree with Border and its shareholders that English Marine is misapplying the standard of review to the facts. First, we must judge the sufficiency of the evidence by comparing it to the charge and instructions that were actually given to the jury. *See Wal-Mart, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). English Marine objected to the charge, arguing that there was no evidence of a contract requiring it to obtain insurance to protect ship owners from their own negligence. However, English Marine did not object or request an instruction on the ground that the jury could not consider Perk's statements in 1985 as evidence of English Marine's liability.

Second, English Marine did not object to the testimony from Gonzalez that Perk agreed to provide insurance coverage sufficient to cover their needs in 1985. Nor did it ask for any instruction to the jury that it could not consider this evidence against Perk's new agency, English Marine. In fact, Perk testified that she purchased the marine "book of business," which included Border's policies, and she serviced this book of business through her new entity, English Marine. There was never any indication that this purchase did not carry over her previous promise to provide insurance sufficient to cover Border's needs.

Thus, English Marine's argument ignores the standard of review applicable to the jury verdict—without any instruction or indication otherwise, reasonable jurors could have concluded that Perk's statements in 1985 that she would obtain insurance for Border and that she "knew what they needed" created a contract to procure insurance sufficient for Border's needs, which was carried over to English Marine. The testimony by both Gonzalez and Swetnam that it was a customary practice of the shipyards to assume responsibility for the boats and any injuries that occurred while the boats were in the

19

shipyard's care, custody, and control was sufficient to demonstrate that what Border "needed" was an insurance policy that protected the boat owners from their own negligence.[6]

Because we reject English Marine's "theory" of the contract claim, and all its arguments depend upon that theory, we hold that the evidence presented at trial could have allowed reasonable and fair-minded people to determine that a contract existed. *City of Keller*, 168 S.W.3d at 827. Furthermore, this evidence was not so weak or the opposing evidence so overwhelming that it was manifestly unjust. Accordingly, the evidence was legally and factually sufficient to sustain the jury's finding that a contract existed. *See id.* at 826; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *Pool*, 715 S.W.2d at 635; *Villagomez*, 210 S.W.3d at 749. English Marine's first issue is overruled.

### 2.     Breach of the Contract

By its second issue, English Marine argues that there is legally and factually insufficient evidence to support the jury's finding that English Marine failed to obtain an insurance policy for Border that would protect ship owners from their own negligence. English Marine argues that it provided a policy that would have provided coverage for Rivera's negligence if Border had properly named Rivera as an additional insured under the contract. It points to Perk's testimony that this provision was explained to Border. English Marine further claims that it had no knowledge that Border had oral indemnity

---

[6] English Marine points to testimony in the record from other shipyard owners that it was not the local custom and practice that the boat owners would be covered for their own negligence. We point out that this evidence merely conflicts with Gonzalez's and Swetnam's testimony. "It is the province of the jury to resolve conflicts in the evidence." *City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex. 2005). Because we review the evidence in the light most favorable to the verdict, we must assume that the jury disregarded this evidence and credited the testimony from Gonzalez and Swetnam. *Id.*

20

agreements with boat owners and disputes that this was a common practice among the local shipyards. Finally, it argues that Border did not even have an oral indemnity agreement with Rivera.

Border and its shareholders argue in response that the testimony established that it was possible for Perk to have obtained an insurance contract that would have covered Rivera's negligence. The fact that St. Paul Mercury denied their claims, and this denial was upheld by the federal district court in the coverage suit, demonstrates that English Marine did not obtain insurance that was "sufficient" to cover their needs. We agree.

Both Perk and English Marine's insurance expert, Beck, admitted that it was possible to obtain an insurance contract that would have covered the boat owners' negligence. Furthermore, Swetnam testified that the insurance application submitted by Perk to Century Surplus Lines included a blank that should have been filled in indicating whether there were any guarantees, warranties, or hold harmless agreements. Swetnam testified that the fact that this blank was left empty indicated to him that Perk never asked the question. Swetnam and Gonzalez both testified that it was a common practice and understanding in the area that when a shipyard performed repairs on a boat, the shipyard assumed the liability for anything that happened to the boat or to anyone on the boat. Had Perk asked the right questions, consistent with her representation that she knew what Border needed and her promise to obtain coverage that corresponded to those needs, Perk would have known that Border needed a policy that would not leave it at risk under these circumstances. Accordingly, there was evidence in the record that would have allowed reasonable and fair-minded people to conclude that English Marine breached its contract. *City of Keller*, 168 S.W.3d at 827. Furthermore, this evidence was not so weak

or the opposing evidence so overwhelming that it was manifestly unjust. Accordingly, the evidence was legally and factually sufficient to sustain the jury's finding that English Marine breached its contract. *See id.* at 826; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *Pool*, 715 S.W.2d at 635; *Villagomez*, 210 S.W.3d at 749. English Marine's second issue is overruled.

Because we find that the judgment can be sustained on Border and its shareholders' breach of contract theory, we need not address English Marine's challenges to the jury's findings of breach of fiduciary duty or unconscionable conduct. *See* TEX. R. APP. P. 47.1.

## C.    Entitlement to Damages

By its fifth issue, English Marine argues that there is legally and factually insufficient evidence to support the jury's award of damages to Border and its shareholders. The charge instructed the jury not to "include any amount of damages that represents funds paid to settle that portion of the lawsuit by the Lopez heirs against Border Shipyards or any of its shareholders." In other words, the jury was instructed that it could only consider funds paid by Border and its shareholders on Rivera's behalf.

English Marine first argues that the evidence is legally and factually insufficient to support an award of damages because Border's shareholders were not "legally obligated" to pay any money to the Lopez heirs on Rivera's behalf. English Marine points out that Rivera asserted a cross-claim against Border itself. That cross-claim alleged that Border breached an express or oral agreement to hold Rivera harmless and to indemnify Rivera. Because the federal district court found that there was not a valid and enforceable

22

agreement between Rivera and Border, English Marine argues that Rivera could not have recovered on his cross-claim against Border because the cross-claim would have been barred by res judicata or collateral estoppel. Although the federal district court noted that Rivera could bring a breach of contract claim for Border's failure to name him as an additional insured under the St. Paul insurance policy, Rivera never amended his cross-claim to include that allegation. Furthermore, because Border is a corporation, and Rivera did not directly sue Border's shareholders or allege that the shareholders were liable for the corporation's obligations, English Marine argues that the shareholders were protected from any liability by the corporate veil. Aside from general law describing collateral estoppel, res judicata, and the corporate veil, English Marine does not cite any cases that support its argument.

In response, Border and its shareholders argue that "settlements are not necessarily entered into to protect defendants from only those claims stated in a plaintiff's petition." The federal district court recognized the potential for Rivera to bring a breach of contract action for Border's failure to name him as an additional insured under the insurance policy. Furthermore, the Lopez heirs alleged that the corporation was a sham to perpetrate a fraud because it was undercapitalized. Border and its shareholders argue that Rivera could have amended his claim to add the shareholders on this basis as well.

We agree with Border and its shareholders. A settlement is the payment of money or anything of value to a claimant in exchange for a release from *potential* liability. *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 320 (Tex. 1994). A defendant is never legally obligated to settle a claim—if the defendant were legally obligated to pay, its liability would not be potential, but actual, and there would be no reason for the plaintiff to "settle."

23

It is certainly possible that Border and its shareholders could have defended the suit by Rivera and asserted that his claims were barred by collateral estoppel or res judicata. Border's shareholders could have also argued that any recovery against the shareholders would require Rivera to pierce the corporate veil. It is also possible, however, that the trial court would have rejected these arguments and that a jury could have awarded a substantially larger amount to the Lopez heirs against Rivera. That possibility is the reason that Border and its shareholders settled the claim. English Marine's argument is based on its flawed premise that Border and its shareholders must prove that they were conclusively obligated to pay the money before they could recover.

Second, English Marine argues that the jury ignored the court's instruction not to award money paid to settle the Lopez claims against Border and its shareholders. English Marine argues that the statute of limitations had run on claims by the Lopez family against Border and its shareholders, so the court instructed the jury not to consider any money paid to settle those claims. Additionally, it argues that there is no evidence of the amount of settlement money paid on Rivera's behalf. Nevertheless, the jury awarded Border's shareholders the full amount they paid to the Lopez heirs to settle all the claims. English Marine does not cite a single case or any authority whatsoever for its argument. *See* TEX. R. APP. P. 38.1(I). Under these circumstances, nothing is presented for our review. *McShane v. Bay Area Healthcare Group, Ltd.,* 174 S.W.3d 908, 913 (Tex. App.–Corpus Christi 2005), *rev'd on other grounds,* 239 S.W.3d 231 (Tex. 2007). Accordingly, we overrule English Marine's fifth issue.

## D.    Proportionate Responsibility

By its seventh issue, English Marine argues that the evidence is factually insufficient

24

to support the jury's answer to question 8, where the jury found that Border was not negligent. English Marine argues that Border's shareholders failed to read any of the policies issued to them, never told English Marine what type of coverage they desired, and could have added Rivera as an additional insured but failed to do so.

We have already determined that the judgment can be sustained on the breach of contract theory, which was presented to the jury in questions 1 and 2 of the jury charge. Question 8, asking about Border's comparative negligence, was conditioned on the jury's affirmative finding in questions 4 and 5, which asked whether English Marine owed and breached a fiduciary duty to Border. This is because comparative responsibility is not a defense to breach of contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.002 (Vernon 2008) (stating that Chapter 33's comparative responsibility provisions apply to tort actions or actions under the Texas Deceptive Trade Practices Act); *Behring Int'l, Inc. v. Greater Houston Bank*, 662 S.W.2d 642, 652 (Tex. App.–Houston [1st Dist.] 1983, writ dism'd); *Trinity Universal Ins. Co. v. Fuller,* 524 S.W.2d 335, 337 (Tex. Civ. App.–Dallas 1975, writ ref'd n.r.e.). Thus, an affirmative finding in response to question 8 would not have prevented a judgment for Border and its shareholders on their breach of contract theory, and we must overrule English Marine's seventh issue.

### III. Settlement Credit

By issue six, English Marine presents a single-paragraph argument:

> The court failed to credit English Marine with the amounts paid in settlement by Century Surplus Lines, a settling defendant. All evidence relevant to the credit was submitted to the court and the court acknowledged its obligation to consider that issue. When the judgment was entered approximately 1½ years after the verdict, the issue was not addressed therein and the trial judge retired from the court.

25

English Marine does not provide any information about the settlement with Century Surplus Lines, nor does it provide any citations to appropriate authority. *See* TEX. R. APP. P. 38.1(I). Under these circumstances, nothing is presented for our review. *McShane,* 174 S.W.3d at 913. English Marine's sixth issue is overruled.

### IV. Conclusion

Having overruled all of English Marine's issues, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion delivered and
filed this the 25th day of November, 2008.